**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **IN RE: COINBASE CUSTOMER DATA SECURITY BREACH LITIGATION** | Case No. 1:25-md-03153-ER<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, by and through undersigned counsel, bring this Consolidated Amended Class Action Complaint on behalf of themselves and all others similarly situated, upon personal knowledge of facts pertaining to themselves and on information and belief and investigation of counsel as to all other matters, against Defendants, Coinbase Global, Inc., its subsidiary Coinbase, Inc. (collectively "Coinbase"), and TaskUs, Inc. ("TaskUs").

## I.       INTRODUCTION

1.       This class action arises from Coinbase's and its third-party vendor TaskUs', failure to protect the sensitive personal and financial information of Coinbase users.  Despite collecting, storing, and profiting from vast amounts of private customer data, Defendants failed to implement and maintain reasonable safeguards to protect that information from unauthorized access, misuse, and disclosure.  Their negligence and disregard for security standards harmed Plaintiffs and the Class and exposed them to serious and ongoing risks of identity theft, account takeovers, and financial fraud.

2.       On or around May 11, 2025, Coinbase was contacted by a malicious actor who claimed responsibility for a significant data breach involving the unauthorized access and exfiltration of confidential Coinbase user data (the "Data Breach").  The actor asserted that they had obtained a substantial volume of personally identifiable information and private financial

information, (together, "Private Information" or "PII") belonging to Coinbase customers, an assertion Coinbase later confirmed.

3.     On May 15, 2025, Coinbase publicly disclosed the breach in a Form 8-K filing with the U.S. Securities and Exchange Commission, revealing that it expected to incur between $180 million and $400 million in expenses related to breach remediation, customer notification, legal exposure, and security improvements—an amount underscoring the magnitude of the incident. Coinbase acknowledged that the threat actor had obtained Coinbase customer data by paying "multiple third-party contractors" working in support roles outside the United States. Coinbase further acknowledged that the threat actor had improperly accessed customer information and confirmed that sensitive data, including names, addresses, government-issued identification, linked bank account information, and transaction histories, had been obtained.

4.     Subsequent reporting identified those "third-party contractors" as employees of TaskUs, a Delaware corporation headquartered in New Braunfels, Texas, that provides business-process outsourcing, customer-service, and account-support operations for major technology companies, including Coinbase. Since at least 2019, Coinbase has relied on TaskUs personnel located in India and the Philippines to perform key customer-facing functions such as account recovery, password resets, and identity verification—tasks requiring access to highly sensitive user information.

5.     TaskUs employees were permitted to access Coinbase customers' confidential and personal information with minimal supervision or audit controls, creating foreseeable and long-standing risks of this information. Those risks materialized in January 2025, when a TaskUs employee at the company's Indore, India facility was observed photographing Coinbase customer

data displayed on her workstation with a personal cell phone, while another employee assisted in exfiltrating that information.

6.      Coinbase confirmed that sensitive customer information had been compromised and that it had received an extortion demand tied to the stolen data.  Despite having knowledge of the breach since at least January 2025, TaskUs failed to disclose the incident in its own February 24, 2025, Form 10-K filing, even as Coinbase prepared to notify regulators and customers.

7.      Following an internal investigation, TaskUs reportedly terminated more than 200 employees "in connection with" the misconduct.  Although the company claimed that only two employees were directly involved in exfiltrating Coinbase data, its sweeping termination of hundreds of workers underscores the breadth of exposure and the lack of adequate vendor oversight.  TaskUs further stated that those employees had been "recruited by a much broader, coordinated criminal campaign," effectively confirming the scale of the security failure within its own operations.

8.      The 2025 incident was not Coinbase's first vendor-related security failure. Between March and May 2021, cybercriminals drained funds from at least 6,000 Coinbase accounts by exploiting weaknesses in Coinbase's multifactor authentication system.  During that period, TaskUs staff handled numerous account-recovery requests.  On information and belief, Coinbase's inadequate supervision of its vendor contributed to the attackers' success and exacerbated losses suffered by affected customers.

9.      Following disclosure of the 2025 Data Breach, numerous Coinbase users— including Plaintiffs and Class Members—were targeted in a sophisticated social-engineering and impersonation scheme.  Attackers posing as Coinbase support personnel contacted customers by phone and email, claiming to warn them about the breach and instructing them to protect their

digital assets. Victims were told to "secure" their cryptocurrency by creating a new digital wallet and transferring their funds into it for safekeeping. In reality, the attackers controlled those wallets, and once customers transferred their assets, the cryptocurrency was immediately stolen and rendered unrecoverable.

10. The Data Breach has exposed the victims' names, phone numbers, account details, last four numbers of their Social Security numbers, government identification images (*i.e.*, driver's licenses, passports), and other account data (including balance snapshots and transaction history). Coinbase's inadequate data security and delayed disclosure enabled the attackers to convincingly impersonate company personnel. These phishing and wallet-diversion scams caused direct and substantial monetary losses to Plaintiffs and Class Members, further compounding the harm caused by Defendants' failure to protect customer data.

11. Not all Plaintiffs and Class Members received a formal data breach notification letter from Coinbase. However, many of those who did not receive letters were subjected to the same fraudulent wallet-diversion scheme as those who did, demonstrating that their personal information was likewise compromised. On information and belief, the number of individuals affected by the breach is substantially greater than Coinbase has publicly acknowledged. The widespread targeting of customers who were never notified of the breach supports the inference that Coinbase's disclosures understated the scope and impact of the incident.

12. These events illustrate a persistent pattern: Coinbase's decision to delegate core security and customer-authentication functions to low-cost, overseas contractors without proper oversight or safeguards created systemic vulnerabilities that directly led to repeated breaches of customer data. Rather than invest in secure, in-house account recovery and authentication systems,

Coinbase relied on third-party vendors like TaskUs, whose employees were given broad access to sensitive user information with little accountability or monitoring.

13.    Despite its knowledge of the vast personal financial information it obtained from users, Coinbase failed to implement basic, industry-standard data protection measures, such as strong encryption, robust access controls, vendor risk assessments, and continuous monitoring for unauthorized activity.  Its neglect of these fundamentals allowed insider threats and foreseeable cyberattacks to compromise millions of users' most Private Information.

14.    The Data Breach was a foreseeable and predictable consequence of Defendants' systemic failure to implement and follow basic cybersecurity procedures.  On information and belief, Coinbase's systems lacked effective real-time monitoring, internal audits, and vendor compliance oversight, allowing the misconduct to persist undetected.  Coinbase's response— delayed, opaque, and inadequate—compounded the harm by leaving victims vulnerable to identity theft, account takeover, and fraud long after the breach occurred.

15.    As a direct and proximate result of Coinbase's negligence and disregard for cybersecurity best practices, Plaintiffs and Class Members have suffered concrete and imminent injuries, including monetary losses, the loss of privacy, exposure of their personal and financial data, risk of future identity theft, and the costs of preventing, detecting, and responding to fraud. Defendants' misconduct has also diminished the value of Plaintiffs' personal information and eroded the trust necessary for customers to safely engage with financial technology platforms.

16.    Plaintiffs bring this action on behalf of all individuals whose personal information was compromised in the Data Breach and related vendor misconduct.  Plaintiffs seek relief including  compensatory  damages,  restitution,  disgorgement  of  profits  obtained  through

Defendants' negligent and unlawful practices, and injunctive relief requiring the implementation of reasonable and verifiable data-security and vendor-oversight measures.

## II.    JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d).  The proposed class consists of more than 100 Members, the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and minimal diversity exists because at least one putative class Member is a citizen of a state different from that of Defendants.

18.    This Court has personal jurisdiction over Defendant Coinbase, which maintains its principal place of business at One Madison Avenue, Suite 2400, New York, New York 10016 and purposefully conducts substantial business within this District.  By offering and providing cryptocurrency services to residents of New York, Coinbase has expressly availed itself of the privilege of conducting activities within the state, thereby invoking the benefits and protections of its laws.

19.    This Court has personal jurisdiction over Defendant TaskUs because it has purposely availed itself of the laws and protections of New York through its substantial contacts with New York based entities, such as Defendant Coinbase.  Further, Defendant TaskUs has caused harm to New York resident Plaintiffs and New York Subclass Members by failing to provide necessary protection for their PII.

20.    Venue is proper in this District under 28 U.S.C. §1391(b) because Coinbase's principal place of business is located in this District, Coinbase transacts business extensively here, and a substantial portion of the acts and omissions giving rise to the claims occurred within this District.

### III.    PARTIES

#### A.    Defendants

21.    Defendant Coinbase Global, Inc. is a publicly traded holding company headquartered in New York City.  As the parent corporation, Coinbase Global, Inc. oversees the operations, governance, and strategic direction of its subsidiaries, including Coinbase, Inc.  Its principal executive offices are located at One Madison Avenue in Manhattan, a central hub of corporate and financial activity.

22.    Defendant Coinbase, Inc. is a wholly owned subsidiary of Coinbase Global, Inc. and serves as the operational arm of the enterprise.  Coinbase, Inc. provides a digital platform through which individuals can buy, sell, store, and trade cryptocurrency assets.  It maintains extensive customer-facing infrastructure and is responsible for collecting and storing sensitive user information as part of its service offerings.  Together, Coinbase Global, Inc. and Coinbase, Inc. operate one of the largest cryptocurrency exchanges in the world.

23.    Defendant TaskUs, Inc. is a Delaware corporation headquartered in Texas.  TaskUs provides outsourcing services to companies worldwide.  Coinbase uses TaskUs's customer support services from TaskUs's call centers in India.

24.    Defendants John Does 1–10 are unknown third-party vendors, contractors, or individuals who provided account-support, IT, data-processing, or security services to Coinbase and who participated in, contributed to, or failed to prevent the unauthorized access and exfiltration of Plaintiffs' and Class Members' information.  Plaintiffs will amend this Complaint to substitute the true names and capacities of these defendants when ascertained through discovery.

### B.    Plaintiffs

#### *Gerard Balian*

25.    Plaintiff Gerard Balian is a citizen of the state of California.  Plaintiff Balian is customer of Coinbase.  On or about May 15, 2025, Plaintiff Balian learned that his PII had been exfiltrated by threat actors because of the Data Breach.

26.    As a result of the Data Breach, Plaintiff Balian has spent time dealing with the consequences, which includes time spent verifying the legitimacy of the Data Breach and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred.  This time has been lost forever and cannot be recaptured.

27.    Plaintiff Balian has suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Balian entrusted to Defendant, which was compromised in and because of the Data Breach.

28.    Plaintiff Balian suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using, and selling his PII.

29.    Plaintiff Balian has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, in combination with his name, being placed in the hands of unauthorized third parties/criminals.

30.    Plaintiff Balian has a continuing interest in ensuring that his PII, which remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

#### *Giovanni Carmassi*

31.    Plaintiff Giovanni Carmassi is a citizen of the state of California.  Plaintiff Carmassi is a customer of Coinbase and has been since 2021.  Plaintiff Carmassi received notice of the Data

Breach on June 3, 2025, when he logged into Coinbase's mobile application and saw a popup notification about the Data Breach informing him that his PII had been exfiltrated by threat actors.

32.    Following the Data Breach, Plaintiff Carmassi had already experienced suspicious activity on his Coinbase account in June 2025 wherein he got a text message notification that an unauthorized individual was attempting to access his accounts.  Plaintiff Carmassi did his due diligence by immediately changing the password on his Coinbase account.

33.    Defendants deprived Plaintiff Carmassi of the earliest opportunity to guard himself against the Data Breach's harmful effects by failing to promptly notify him about it.  Instead, Defendants waited almost four months, without any explanation whatsoever.

34.    As a result of the Data Breach, Plaintiff Carmassi has spent time dealing with the consequences, which includes time spent verifying the legitimacy of the Data Breach and self-monitoring his accounts and credit reports to ensure no fraudulent activity had occurred.  This time has been lost forever and cannot be recaptured.

35.    Plaintiff Carmassi has suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Balian entrusted to Defendant, which was compromised in and because of the Data Breach.

36.     Plaintiff Carmassi suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using, and selling his PII.

37.    Plaintiff Carmassi has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, in combination with his name, being placed in the hands of unauthorized third parties/criminals.

38.    Plaintiff Carmassi has a continuing interest in ensuring that his PII, which remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

### Matthew Edlin

39.    Plaintiff Matthew Edlin is a citizen of the state of California.  Plaintiff Edlin is a customer of Coinbase and has been since 2020.  On or about May 15, 2025, Plaintiff Eisenberg learned that his PII had been exfiltrated by threat actors because of the Data Breach.

40.    As a result of the Data Breach, Plaintiff Edlin has spent time dealing with the consequences, which includes time spent verifying the legitimacy of the Data Breach and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred.  This time has been lost forever and cannot be recaptured.

41.    Plaintiff Edlin has suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Edlin entrusted to Defendant, which was compromised in and because of the Data Breach.

42.     Plaintiff Edlin suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using, and selling his PII.

43.     Plaintiff Edlin has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, in combination with his name, being placed in the hands of unauthorized third parties/criminals.

44.    Plaintiff Edlin has a continuing interest in ensuring that his PII, which remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

**Michael Eisenberg**

45.     Plaintiff Michael Eisenberg is a citizen of the state of California.    Plaintiff Eisenberg is a customer of Coinbase.  On or about May 15, 2025, Plaintiff Eisenberg learned that his PII had been exfiltrated by threat actors because of the Data Breach.

46.     Following the incident, Plaintiff Eisenberg had to cancel a credit card due to fraudulent charges made by an unauthorized user in the amount of $4,500.  As a result of this theft, Plaintiff Eisenberg has had to devote time to disputing the transaction, replacing the card, and securing his account information.

47.     Plaintiff Eisenberg has received and continues to receive numerous scam texts, calls, and emails related to a Coinbase phishing scam.

48.     As a result of the Data Breach, Plaintiff Eisenberg has spent time dealing with the consequences, which includes time spent verifying the legitimacy of the Data Breach and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred.  This time has been lost forever and cannot be recaptured.

49.     Plaintiff Eisenberg has suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Eisenberg entrusted to Defendant, which was compromised in and because of the Data Breach.

50.      Plaintiff Eisenberg suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using, and selling his PII.

51.      Plaintiff Eisenberg has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, in combination with his name, being placed in the hands of unauthorized third parties/criminals.

52.    Plaintiff Eisenberg has a continuing interest in ensuring that his PII, which remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

### Matt Grove

53.    Plaintiff Matt Grove is a citizen of the state of California. Plaintiff Grove is a customer of Coinbase.  Plaintiff Grove learned of the Data Breach in May 2025 and that his PII had been exfiltrated by threat actors.

54.    Soon after learning about the Data Breach, Plaintiff Grove started receiving spam calls and texts relating to his Coinbase account.

55.    On or about January 17, 2025, Plaintiff Grove was locked out of his Coinbase account because his password and credentials were compromised.  He had to spend time regaining access, as well as resetting his account password and multi-factor authentication.  This occurred two more times, in February and July of 2025.

56.    Also in July of 2025, following the security incident, Plaintiff Grove received a communication from Capital One requesting verification of some suspicious charges.  As a result, Plaintiff Grove needed to replace the credit card and update payment data across multiple payment accounts the card was linked to.

57.    As a result of the Data Breach, Plaintiff Grove has spent time dealing with the consequences, which includes time spent verifying the legitimacy of the Data Breach and self-monitoring his accounts and credit reports to ensure no fraudulent activity had occurred.  This time has been lost forever and cannot be recaptured.

58.    Plaintiff Grove has suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Grove entrusted to Defendant, which was compromised in and because of the Data Breach.

59.    Plaintiff Grove suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using, and selling his PII.

60.    Plaintiff Grove has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, in combination with his name, being placed in the hands of unauthorized third parties/criminals.

61.    Plaintiff Grove has a continuing interest in ensuring that his PII, which remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

### Adam McAfee

62.    Plaintiff Adam McAfee is a citizen of the state of California.  Plaintiff McAfee has been a customer of Coinbase since 2020.  On or about May 15, 2025, Plaintiff McAfee first learned of the Data Breach and that his PII had been exfiltrated by threat actors.

63.    Plaintiff McAfee started receiving spam calls and texts relating to his Coinbase account soon after he heard about the Data Breach and has been locked out of his Coinbase account and unable to access his account or verify the balance of his account.

64.    As a result of the Data Breach, Plaintiff McAfee has spent approximately 10 hours dealing with the consequences, which includes time spent responding to texts and calls claiming to be from Coinbase, attempting to contact Coinbase customer service, verifying the legitimacy of the Data Breach and self-monitoring his accounts and credit reports to ensure no fraudulent activity had occurred.  This time has been lost forever and cannot be recaptured.

65.    Plaintiff McAfee has suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff McAfee entrusted to Defendant, which was compromised in and because of the Data Breach.

66.     Plaintiff McAfee suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using, and selling his PII.

67.     Plaintiff McAfee has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, in combination with his name, being placed in the hands of unauthorized third parties/criminals.

68.     Plaintiff McAfee has a continuing interest in ensuring that his PII, which remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

### Timothy Scheuber

69.     Plaintiff Timothy Scheuber is a citizen of the state of California. Plaintiff Scheuber is a customer of Coinbase.  On or about May 2025, Plaintiff Scheuber first learned of the Data Breach and that his PII had been exfiltrated by threat actors.  Plaintiff Scheuber has received spam emails, calls, and texts relating to his Coinbase account.

70.     In September 2025, Plaintiff Scheuber was informed by LifeLock, whose identity-protection services he has been using since February 2018, that his information appeared on the "dark web."

71.     On or about October 20, 2025, Plaintiff Scheuber received a text message from someone purporting to be from Coinbase, saying that someone registered Plaintiff's Coinbase account in Canada.

72.     As a result of the Data Breach, Plaintiff Scheuber has spent time dealing with the consequences, which includes time spent verifying the legitimacy of the Data Breach and self-monitoring his accounts and credit reports to ensure no fraudulent activity had occurred.  This time has been lost forever and cannot be recaptured.

73.    Plaintiff Scheuber has suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Scheuber entrusted to Defendant, which was compromised in and because of the Data Breach.

74.    Plaintiff Scheuber suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using, and selling his PII.

75.    Plaintiff Scheuber has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, in combination with his name, being placed in the hands of unauthorized third parties/criminals.

76.    Plaintiff Scheuber has a continuing interest in ensuring that his PII, which remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

### John Ramo

77.    Plaintiff John Ramo is a citizen of the state of Colorado.  Plaintiff Ramo is a customer of Coinbase and his PII was exfiltrated by threat actors.

78.    On May 8, 2025, attackers exploited Plaintiff Ramo's PII, to deceive him into transferring funds to the perpetrators.  As a result of the Data Breach, Plaintiff Ramo lost approximately $5,000 in the fraudulent transaction.

79.    Prior to the scam, Plaintiff Ramo had no knowledge of the Data Breach.  He was never notified by Coinbase and only learned of the security incident through a press release.

80.    Since then, Plaintiff Ramo has spent a significant amount of time reporting the incident to both Coinbase and local authorities.  On May 12, 2025, Plaintiff Ramo reported the breach to the Eagle County Sheriff's Office.

81.    Plaintiff Ramo has since learned of the Data Breach and that his PII had been exposed.  As a result of the Data Breach, Plaintiff Ramo has spent time dealing with the consequences, which includes time spent verifying the legitimacy of the Data Breach and self-monitoring his accounts and credit reports to ensure no fraudulent activity had occurred.  This time has been lost forever and cannot be recaptured.

82.    Plaintiff Ramo has suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Ramo entrusted to Defendant, which was compromised in and because of the Data Breach.

83.    Plaintiff Ramo suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using, and selling his PII.

84.    Plaintiff Ramo has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, in combination with his name, being placed in the hands of unauthorized third parties/criminals.

85.    Plaintiff Ramo has a continuing interest in ensuring that his PII, which remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

### *Zaal Panthaki*

86.    Plaintiff Zaal Panthaki is a citizen of the state of Maine. Plaintiff Panthaki is a customer of Coinbase.  In May 2025, Plaintiff Panthaki first learned of the data breach from a post on X (formerly Twitter) and that his PII had been exfiltrated by threat actors.

87.    As a result of the Data Breach, Plaintiff Panthaki has spent time dealing with the consequences, which includes time spent verifying the legitimacy of the Data Breach and self-

monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured.

88.    Plaintiff Panthaki has suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Panthaki entrusted to Defendant, which was compromised in and because of the Data Breach.

89.    Plaintiff Panthaki suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using, and selling his PII.

90.    Plaintiff Panthaki has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, in combination with his name, being placed in the hands of unauthorized third parties/criminals.

91.    Plaintiff Panthaki has a continuing interest in ensuring that his PII, which remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

*Rachel Sullivan*

92.    Plaintiff Rachel Sullivan is a citizen of the state of Massachusetts. Plaintiff Sullivan is a customer of Coinbase. On or about May 15, 2025, Plaintiff Sullivan learned that her PII had been exfiltrated by threat actors because of the Data Breach.

93.    Plaintiff Sullivan has received spam emails, calls, and texts relating to her Coinbase account.

94.    On or about May 1, 2025, prior to learning of the security incident, Plaintiff Sullivan received an email, as well as notification from the Coinbase app that her Coinbase account was locked due to unauthorized access. Plaintiff Sullivan had to spend time passing security

checks to regain access and changing her login credentials. The entire process took approximately three days to resolve.

95. In September 2025, Plaintiff Sullivan was notified by Discover that there was a $400 charge on her credit card, which she knew was unauthorized. Plaintiff Sullivan had to spend time replacing her credit card, getting a new account number, and unlinking her accounts to the credit card. The entire process took about ten days to resolve.

96. As a result of the Data Breach, Plaintiff Sullivan has spent time dealing with the consequences, which includes time spent verifying the legitimacy of the Data Breach and self-monitoring her accounts and credit reports to ensure no fraudulent activity has occurred. Plaintiff Sullivan also lost approximately three hours of work dealing with the fraudulent credit card activity, which cost her $120 in lost wages. This time has been lost forever and cannot be recaptured.

97. Plaintiff Sullivan has suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that Plaintiff Sullivan entrusted to Defendant, which was compromised in and because of the Data Breach.

98. Plaintiff Sullivan suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using, and selling her PII.

99. Plaintiff Sullivan has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, in combination with her name, being placed in the hands of unauthorized third parties/criminals.

100. Plaintiff Sullivan has a continuing interest in ensuring that her PII, which remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

*Alexander Mirvis*

101.    Plaintiff Alexander Mirvis is a citizen of the state of New York. Plaintiff Mirvis is a customer of Coinbase.  On or about May 2025, Plaintiff Mirvis learned of the Data Breach and that his PII had been exfiltrated by threat actors.

102.    As a result of the Data Breach, Plaintiff Mirvis has spent time dealing with the consequences, which includes time spent verifying the legitimacy of the Data Breach and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured.

103.    Plaintiff Mirvis has suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Mirvis entrusted to Defendant, which was compromised in and because of the Data Breach.

104.    Plaintiff Mirvis suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using, and selling his PII.

105.     Plaintiff Mirvis has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, in combination with his name, being placed in the hands of unauthorized third parties/criminals.

106.     Plaintiff Mirvis has a continuing interest in ensuring that his PII, which remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

*Aaron Rahman*

107.    Plaintiff Aaron Rahman is a citizen of the state of New York.  Plaintiff Rahman is a customer of Coinbase.  Plaintiff Rahman learned about the Data Breach in May 2025, that his

PII was exfiltrated by threat actors and soon after started receiving spam text messages relating to his Coinbase account.

108.    As a result of the Data Breach, Plaintiff Rahman has spent time dealing with the consequences, which includes time spent verifying the legitimacy of the Data Breach and self-monitoring his accounts and credit reports to ensure no fraudulent activity had occurred.  This time has been lost forever and cannot be recaptured.

109.    Plaintiff Rahman has suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Rahman entrusted to Defendant, which was compromised in and because of the Data Breach.

110.    Plaintiff Rahman suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using, and selling his PII.

111.    Plaintiff Rahman has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, in combination with his name, being placed in the hands of unauthorized third parties/criminals.

112.    Plaintiff Rahman has a continuing interest in ensuring that his PII, which remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

### Andrew Squeo

113.    Plaintiff Andrew Squeo is a citizen of the state of New York.  Plaintiff Squeo is a customer of Coinbase.  On or about May 15, 2025, Plaintiff Squeo learned that his PII had been exfiltrated by threat actors because of the Data Breach.  He was unaware of the Data Breach until the notice was published.

114.    As a result of the Data Breach, Plaintiff Squeo has spent time dealing with the consequences, which includes time spent verifying the legitimacy of the Data Breach and self-monitoring his accounts and credit reports to ensure no fraudulent activity had occurred.  This time has been lost forever and cannot be recaptured.

115.    Plaintiff Squeo has suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Squeo entrusted to Defendant, which was compromised in and because of the Data Breach.

116.    Plaintiff Squeo suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using, and selling his PII.

117.    Plaintiff Squeo has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, in combination with his name, being placed in the hands of unauthorized third parties/criminals.

118.    Plaintiff Squeo has a continuing interest in ensuring that his PII, which remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

### Rosemary Ortiz

119.    Plaintiff Rosemary Ortiz is a citizen of the state of South Carolina.  Plaintiff Ortiz is a customer of Coinbase.  On or about May 15, 2025, Plaintiff Ortiz learned that her PII had been exfiltrated by threat actors because of the Data Breach.

120.    As a result of the Data Breach, Plaintiff Ortiz has spent time dealing with the consequences, which includes time spent verifying the legitimacy of the Data Breach and self-monitoring her accounts and credit reports to ensure no fraudulent activity had occurred.  This time has been lost forever and cannot be recaptured.

121.    Plaintiff Ortiz has suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that Plaintiff Ortiz entrusted to Defendant, which was compromised in and because of the Data Breach.

122.    Plaintiff Ortiz suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using, and selling his PII.

123.    Plaintiff Ortiz has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, in combination with her name, being placed in the hands of unauthorized third parties/criminals.

124.    Plaintiff Ortiz has a continuing interest in ensuring that her PII, which remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

### *Alexander Crous*

125.    Plaintiff Alexander Crous is a citizen of the state of Texas.  Plaintiff Crous is a customer of Coinbase.  On or about May 2025, Plaintiff Crous learned of the Data Breach and that his PII had been exfiltrated by threat actors.

126.    As a result of the Data Breach, Plaintiff Crous has spent time dealing with the consequences, which includes time spent verifying the legitimacy of the Data Breach and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred.  This time has been lost forever and cannot be recaptured.

127.    Plaintiff Crous has suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Crous entrusted to Defendant, which was compromised in and because of the Data Breach.

128.    Plaintiff Crous suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using, and selling his PII.

129.    Plaintiff Crous has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, in combination with his name, being placed in the hands of unauthorized third parties/criminals.

130.    Plaintiff Crous has a continuing interest in ensuring that his PII, which remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

### *Miguel Gonzalez*

131.    Plaintiff Miguel Gonzalez is a citizen of the state of Texas.  Plaintiff Gonzalez is a customer of Coinbase and his PII was exfiltrated by threat actors.  Plaintiff Gonzalez became aware of the Data Breach in or around May 2025, and that his data had been exposed.  Shortly after the Data Breach, Plaintiff Gonzalez received a series of suspicious emails, that appeared to be from Coinbase, requesting he provide additional personal information.

132.    In response to the security incident, Plaintiff Gonzalez has reasonably incurred out-of-pocket expenses, including a $99-per-month subscription to CreditCaptain.com for credit monitoring and identity theft insurance services, to mitigate the risk of further misuse of his personal information following the Data Breach.

133.    As a result of the Data Breach, Plaintiff Gonzalez has spent time dealing with the consequences, which includes time spent verifying the legitimacy of the Data Breach, changing passwords and self-monitoring his accounts and credit reports to ensure no fraudulent activity had occurred.  This time has been lost forever and cannot be recaptured.

134.    Plaintiff Gonzalez has suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Gonzalez entrusted to Defendant, which was compromised in and because of the Data Breach.

135.    Plaintiff Gonzalez suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using, and selling his PII.

136.    Plaintiff Gonzalez has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, in combination with his name, being placed in the hands of unauthorized third parties/criminals.

137.    Plaintiff Gonzalez has a continuing interest in ensuring that his PII, which remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

### *Anthony Quito*

138.    Plaintiff Anthony Quito is a citizen of the state of Washington. Plaintiff Quito is a customer of Coinbase.  On or about May 15, 2023, Plaintiff Quito learned that his PII had been exfiltrated by threat actors because of the Data Breach.

139.    As a result of the Data Breach, Plaintiff Quito has spent time dealing with the consequences, which includes time spent verifying the legitimacy of the Data Breach and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred.  This time has been lost forever and cannot be recaptured.

140.    Plaintiff Quito has suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Quito entrusted to Defendant, which was compromised in and because of the Data Breach.

141.    Plaintiff Quito suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using, and selling his PII.

142.    Plaintiff Quito has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, in combination with his name, being placed in the hands of unauthorized third parties/criminals.

143.    Plaintiff Quito has a continuing interest in ensuring that his PII, which remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

### Benjamin Neu

144.    Plaintiff Benjamin Neu is a citizen of the state of Wisconsin.  Plaintiff Neu is a customer of Coinbase.  Plaintiff Neu learned of the Data Breach on or about February 19, 2025 and that his PII, to wit, his Social Security number and email address had been exfiltrated by threat actors, when Plaintiff received an alert from Experian.

145.    On or about March 7, 2025, Plaintiff Neu received a text from an unauthorized third-party impersonating an employee of Coinbase.  The scammer requested a withdrawal code for Plaintiff's Coinbase account.

146.    As a result of the Data Breach, Plaintiff Neu has spent time dealing with the consequences, which includes time spent verifying the legitimacy of the Data Breach and self-monitoring his accounts and credit reports to ensure no fraudulent activity had occurred.  This time has been lost forever and cannot be recaptured.

147.    Plaintiff Neu has suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Neu entrusted to Defendant, which was compromised in and because of the Data Breach.

148.    Plaintiff Neu suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using, and selling his PII.

149.    Plaintiff Neu has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, in combination with his name, being placed in the hands of unauthorized third parties/criminals.

150.    Plaintiff Neu has a continuing interest in ensuring that his PII, which remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

### Keefe John

151.    Plaintiff Keefe John is a citizen of the state of Wisconsin. Plaintiff John is a customer of Coinbase.  On or about May 15, 2025, Plaintiff John learned that his PII had been exfiltrated by threat actors due to the Data Breach.

152.    Plaintiff John began receiving emails and texts from unauthorized third-parties impersonating Coinbase employees.

153.    As a result of the Data Breach, Plaintiff John has spent time dealing with the consequences, which includes time spent verifying the legitimacy of the Data Breach and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred.  This time has been lost forever and cannot be recaptured.

154.    Plaintiff John has suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff John entrusted to Defendant, which was compromised in and because of the Data Breach.

155.    Plaintiff John suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using, and selling his PII.

156.    Plaintiff John has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, in combination with his name, being placed in the hands of unauthorized third parties/criminals.

157.    Plaintiff John has a continuing interest in ensuring that his PII, which remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

## IV.    FACTUAL ALLEGATIONS

### A.    *The Data Breach and Defendants' Failure to Respond Adequately*

158.    On or around May 11, 2025, a cybercriminal contacted Coinbase to claim responsibility for a significant data breach involving the unauthorized access and exfiltration of confidential user data (the "Data Breach".)  The actor asserted that they had obtained a substantial volume of PII belonging to Coinbase customers—an assertion Coinbase later confirmed.

159.    In a May 15, 2025, Form 8-K filing with the U.S. Securities and Exchange Commission, Coinbase publicly disclosed the breach and revealed the potential scale of the incident. Coinbase stated that it anticipated incurring between $180 million and $400 million in expenses associated with breach remediation, forensic investigations, customer notification, legal exposure, and heightened security measures—a figure indicative of the extreme severity and scope of the incident.[1]

---

[1]    Coinbase Glob. Inc., Current Report (Form 8-K) (May 15, 2025); *see also* Paul Vigna, *Coinbase Says Customer Data Stolen, Held for Ransom*, WALL STREET JOURNAL. (May 15, 2025), https://www.wsj.com/finance/currencies/coinbase-global-says-customer-data-stolen-held-for-ransom-e5108336.

160.    Despite the magnitude of the breach, Coinbase's immediate response was inadequate, fragmented, and delayed. Users were not promptly or fully informed of the compromise, and Coinbase did not immediately take meaningful steps to mitigate further harm, provide identity protection services, or offer actionable guidance to affected individuals.

161.    Coinbase has admitted that the Data Breach compromised users' PII, to wit, names, addresses, phone numbers, emails; masked Social Security numbers (last 4 digits only); masked bank-account numbers and bank account identifiers, including Government-ID images (e.g., driver's license, passport); Account data (balance snapshots and transaction history); and Limited corporate data (including documents, training material, and communications available to support agents)."[2]  Coinbase failed to adequately secure users' personal and financial information as demonstrated by the attacker's apparent ability to retrieve the information in a usable and unredacted state.

162.    The nature and precision of the breach strongly suggest that Coinbase was intentionally targeted. As one of the most prominent cryptocurrency platforms globally, Coinbase holds large volumes of sensitive user data, making it a prime target for financially motivated cybercriminals. The stolen PII can be used or sold to facilitate a range of identity-related crimes, including: opening unauthorized bank or credit accounts, applying for loans or benefits, filing fraudulent tax returns, obtaining false identification documents, and impersonating victims in interactions with law enforcement or financial institutions.

163.    As a result of Coinbase's lax data security practices, Plaintiffs and Class Members now face a substantial, immediate, and ongoing threat of identity theft and financial fraud. The

---

[2]    *Id.*

consequences of the breach are long-term and potentially permanent, as the compromised information cannot be recovered or made secure once exposed.

164.    Coinbase knew and understood that as a holder of such valuable personal and financial data, it would be subject to attempts to infiltrate its systems to steal user data.  Coinbase's failure to prevent this breach is especially egregious given the well-documented risks of cyberattacks targeting consumer financial platforms.  Despite its expansive customer base and substantial financial resources.

165.    Defendant failed to adequately encrypt or otherwise safeguard the sensitive PII that was accessed and exfiltrated in the Data Breach.  To the extent Defendant claims to encrypt data in transit and at rest, such measures were either not in place or were ineffective in preventing unauthorized access.

166.    Coinbase also failed to ensure that its personnel received adequate training in information security.  Employees and contractors with access to sensitive data were not properly instructed on secure handling protocols, including limiting access based on role, securing endpoints, and adhering to company-wide guidelines on PII protection.

167.    These failures led directly to the unauthorized disclosure of Plaintiffs' and Class Members' personal information to an external actor, who exploited vulnerabilities in Coinbase's systems to gain access without detection.  The resulting exposure has placed victims at serious and continuing risk.

168.    Coinbase's security failures represent a clear breach of its legal, contractual, and ethical obligations to safeguard customer data.  The company ignored established cybersecurity standards and best practices promulgated by regulatory bodies, including the Federal Trade Commission (FTC), as well as guidelines widely adopted by the financial services industry.

169.    Though Coinbase publicly markets itself as a technologically advanced platform, it neglected to implement baseline protections such as timely software patching, secure adequate encryption protocols, and robust access controls.  These omissions reflect systemic neglect and prioritization of growth and profitability over user security.

170.    Coinbase also failed to audit and train internal personnel—particularly those with privileged access to sensitive data—on applying critical security updates, detecting suspicious activity, and following operational protocols designed to prevent unauthorized access.  This failure reflects a broader breakdown in Coinbase's internal governance and risk management practices.

171.    Since at least 2019, Coinbase has relied on TaskUs, Inc., a Texas-based outsourcing firm with operations in India and the Philippines, to provide account recovery, identity-verification, password-reset, and customer-support services for Coinbase users.  These functions required TaskUs personnel to access sensitive customer information, including names, addresses, government-issued identification, account numbers, and transaction history.[3]

172.    TaskUs employees were routinely permitted to view, download, and process Coinbase users' confidential information with minimal supervision, monitoring, or audit trails, creating a foreseeable risk of compromise.  Coinbase failed to require adequate technical or administrative safeguards governing its vendor's handling of customer data.

173.    Between March and May 2021, cybercriminals drained funds from at least 6,000 Coinbase accounts after exploiting weaknesses in Coinbase's multifactor-authentication system.[4]  During that period, TaskUs staff handled numerous account-recovery requests.  Coinbase's inadequate oversight of its vendor contributed to the attackers' success.

---

[3]        *See* TaskUs, Inc., Annual Report (Form 10-K) (Mar. 9, 2022).
[4]        *See* Letter from Coinbase to Att'y Gen. of Cal. (Sept. 24, 2021), available at https://oag.ca.gov/system/files/09-24-2021%20Customer%20Notification.pdf.

174.    Customer complaints from 2021 and 2022 described users being locked out of their accounts following "recovery" attempts through Coinbase's outsourced TaskUs support, highlighting the systemic vulnerability created by this vendor relationship.[5]

175.    In January 2025, Coinbase learned of an insider breach at TaskUs's Indore, India facility.  A TaskUs employee was observed photographing Coinbase customer data on her workstation using a personal cell phone, while a colleague assisted in exfiltrating that data.[6]

176.    Coinbase confirmed that sensitive customer information had been compromised. On May 11, 2025, Coinbase received an extortion demand tied to the stolen data and disclosed the incident in its May 14, 2025, Form 8-K, acknowledging that "certain third-party contractors" had improperly accessed customer information.[7]

177.    Following its internal investigation, TaskUs reportedly terminated more than 200 employees at the Indore facility "in connection with" the misconduct.  While TaskUs stated that only two employees were directly involved in photographing and exfiltrating Coinbase data, its own sweeping termination of over 200 workers evidences the breadth of exposure and the absence of effective controls.[8]  TaskUs nonetheless omitted any mention of the incident from its Form 10-K filed Feb. 24, 2025, despite having known of the breach for months.

178.    TaskUs insiders accessed not only personally identifiable information but also bank-account data, government IDs, and transaction histories capable of facilitating account takeovers.

---

[5]    *See, e.g.*, Better Business Bureau Complaints Re: Coinbase Account Recovery (2021-2022).
[6]    *See* Aditya Kalra, Coinbase Breach Linked to Customer Data Leak in India, Sources Say, Reuters (June 2, 2025).
[7]    *See* Coinbase Global, Inc., Current Report (Form 8-K) (May 14, 2025).
[8]    *See* Aditya Kalra, Coinbase Breach Linked to Customer Data Leak in India, Sources Say, Reuters (June 2, 2025).

179.    These events demonstrate Coinbase's reckless and continuing dependence on third-party vendors for core security functions.  Rather than investing in secure, in-house account-recovery and authentication systems, Coinbase delegated those tasks to overseas contractors with broad access to user data and insufficient controls.

180.    Coinbase's failure to monitor TaskUs and enforce adequate vendor-security standards caused two distinct but related harms: (i) the 2021 account-takeover losses and (ii) the 2025 insider theft and extortion of customer information.  These incidents collectively reflect a sustained pattern of negligence and disregard for customer-data protection obligations.

181.    Coinbase relied on multiple third-party technology vendors and contractors to perform customer-support, identity-verification, and data-management functions involving sensitive customer information.

182.    Coinbase has not publicly disclosed the full identities or security obligations of all vendors with access to customer PII.  Plaintiffs allege that these undisclosed vendors, along with Coinbase, maintained or transmitted customer data in ways that exposed Plaintiffs and the Class to unreasonable risk of unauthorized access and misuse.

183.    Defendants John Does 1–10 are unknown third-party vendors, contractors, or individuals who provided account-support, IT, data-processing, or security services to Coinbase and who participated in, contributed to, or failed to prevent the unauthorized access and exfiltration of Plaintiffs' and Class Members' information. Plaintiffs will amend this Complaint to substitute the true names and capacities of these defendants when ascertained through discovery.

## B.  Defendants' Collection of PII and Legal Duty to Safeguard this PII

184.    As part of its core business operations, Coinbase, Inc. collects, stores, and processes a vast amount of PII from individuals who sign up to use its cryptocurrency exchange platform.

This information includes names, dates of birth, physical and email addresses, phone numbers, government-issued identification documents, Social Security numbers, banking and payment details, and user transaction histories.  Such data is obtained both during the onboarding of new users and throughout ongoing account activity.

185.    Coinbase requires customers to submit this information as a condition of accessing its services, including for identity verification, fraud prevention, and compliance with financial regulations such as Know Your Customer ("KYC") and anti-money laundering ("AML") laws. In doing so, Coinbase represents—explicitly and implicitly—that it will safeguard the information using reasonable and industry-standard security measures.

186.    By collecting and deriving commercial benefit from this PII, Defendants assumed legal, contractual, and equitable obligations to protect it.  Coinbase had a duty to implement appropriate technical and administrative safeguards to ensure that customer data remained confidential, secure, and protected against unauthorized access, use, or disclosure.

187.    Plaintiffs and Class Members reasonably relied on Coinbase's representations, public statements, privacy policies, and course of dealing to believe that their Private Information would be handled responsibly and stored securely.  Coinbase's failure to maintain the confidentiality and integrity of this data—by exposing it through inadequate cybersecurity measures—violated that trust and breached its duties.

188.    At all relevant times, Coinbase owed a duty to Plaintiffs and Class Members to protect their PII from unauthorized access, theft, and disclosure.  This duty arose from its role as a custodian of sensitive financial and identification data and encompassed the obligation to implement and maintain reasonable data security measures, train personnel on secure data

practices, detect and respond to threats in real time, and promptly notify users upon discovering any breach of security.

189.    Despite possessing substantial financial and technological resources, Coinbase failed to make adequate investments in cybersecurity infrastructure.  It neglected to effectively deploy essential protections such as data encryption, network intrusion detection, endpoint monitoring, and rigorous access controls.  This failure to safeguard PII constitutes a violation of Coinbase's obligations under common law, regulatory expectations, and industry best practices.

190.    Security standards widely recognized in the financial and technology sectors for the protection of sensitive user data include, but are not limited to, the following:

    a.    Implementing internal access controls to ensure that employees and contractors can only access the specific data required to perform their job functions;

    b.    Establishing continuous monitoring and auditing protocols to detect and respond to unauthorized access or anomalous behavior in real time;

    c.    Deploying insider threat detection tools and behavior analytics to identify malicious or negligent actions by internal personnel;

    d.    Enforcing strict data access policies, including the principle of least privilege and role-based access controls, to reduce unnecessary data exposure;

    e.    Providing mandatory and ongoing employee training on information security best practices, phishing awareness, and social engineering defense;

    f.    Developing and maintaining a tested incident response plan, enabling prompt containment and mitigation of data breaches to prevent further data exfiltration.

191.    While Coinbase states in its Global Privacy Policy—under the section titled "How We Protect Your Information"—that it encrypts sensitive information (such as financial data) both

in transit and at rest, the effectiveness and adequacy of those security measures are called into question by the nature and scope of the Data Breach. Based on the breadth and apparent usability of the stolen data—including government-issued ID images, banking details, and partial Social Security numbers—it is reasonable to infer that either such information was not properly encrypted, or that the encryption was inadequate, improperly implemented, or bypassed due to insufficient access controls or internal security practices. The attackers' ability to exfiltrate and attempt to extort Coinbase using this data strongly suggests that Coinbase's data protection measures failed to prevent unauthorized access to highly sensitive information.

192.    Despite the severity of the breach and the risks to affected users, Coinbase has not offered victims any form of credit monitoring, identity theft protection, or fraud resolution assistance. This omission stands in contrast to standard industry practices and reinforces the perception that Coinbase is downplaying the seriousness of the breach.

193.    By failing to provide post-breach support to its users, Coinbase has left millions of affected individuals to manage the fallout independently, even though they had no role in causing the breach. This response not only compounds the harm caused but also underscores Coinbase's failure to meet its responsibilities as a custodian of sensitive personal and financial information.

194.    Coinbase was obligated—by contract, industry standards, and common law—to maintain the confidentiality of Plaintiffs' and Class Members' PII and to protect it from unauthorized access. These obligations were reinforced by Coinbase's privacy policies and its public assurances that it employs strong security measures to protect user information.

195.    This breach was entirely preventable with reasonable cybersecurity practices. Coinbase could have avoided or significantly limited the scope of the breach by implementing and maintaining appropriate security measures, including but not limited to effective encryption of

sensitive data, robust access controls (particularly for third-party contractors), timely software patching, and automated threat detection systems. Its failure to employ such safeguards—despite the highly sensitive nature of the data it collects and stores—directly contributed to the unauthorized access and exfiltration of Class Members' personal and financial information.

### C. Coinbase Assures Its Customers of the Safety and Security of Their Personal Information

196.    To utilize Coinbase's cryptocurrency services, customers like Plaintiffs must provide Defendant directly with highly sensitive and Private Information. Defendants claim to be "the most trusted and secure place for people and businesses to buy, sell, and manage crypto."[9]

197.    Coinbase understands that data cybersecurity is critical. Defendants claim to "respect and protect the privacy of those who explore our Services . . . and Users who sign up for and access our Services[.]"[10] Coinbase claims that "it is in our interest and the interests of our Users and Customers to secure our platform and network, to verify accounts and activity, to combat harmful conduct, to detect, prevent and address fraud, abuse, spam and other bad experiences."[11] Coinbase further admits that "[o]ur Services are subject to laws and regulations requiring us to collect, use, and store your personal information in certain ways."[12] Coinbase also assures its users that basic customer information, supplemental identification information and electronic identification information are "securely maintained by Coinbase and its service providers, and is only disclosed where permitted by law."[13]

198.    Despite these strong proclaimed proactive policies and approaches to data security and privacy for their customers, Defendants failed to adequately secure and safeguard its systems

---

[9]        https://www.coinbase.com (last accessed June 5, 2025).
[10]       Coinbase Global Privacy Policy, COINBASE (Mar. 26, 2024) https://www.coinbase.com/legal/privacy (last accessed June 5, 2025).
[11]       *Id.*
[12]       *Id.*
[13]       *Id.*

and networks from a foreseeable and preventable cyberattack. This conduct proximately resulted in the Data Breach and significant harm to Plaintiff and the Class.

199.    The unauthorized access and disclosure of Plaintiffs' personal information constituted a serious invasion of privacy and loss of confidentiality. Plaintiffs entrusted Coinbase and its vendors with sensitive identifying data, reasonably expecting it would remain secure. Defendants' failure to safeguard that information exposed Plaintiffs to identity theft, fraud, and ongoing anxiety over the misuse of their data.

### D. Coinbase's Failure to Protect PII Amid a Foreseeable Cybersecurity Threat Landscape

200.    By collecting and using this data in the course of offering financial services and for its own commercial benefit, Coinbase assumed legal and equitable duties to protect such information from unauthorized access or disclosure.

201.    Plaintiffs and Class Members took reasonable steps to protect their own PII and entrusted Coinbase to uphold its promise and legal obligation to maintain the confidentiality and security of that data.

202.    Consumers place extraordinary value on the security and privacy of their personal information, especially when transacting on platforms handling digital currency. Identity theft resulting from data breaches causes immediate and long-term harm, including financial losses, reputational damage, credit impairment, emotional distress, and substantial time spent attempting to mitigate the consequences.[14]

203.    Data breaches materially increase the risk of identity theft. According to the U.S. Department of Justice, identity theft results in both direct and indirect losses. Direct losses include stolen funds and fraudulent transactions, while indirect losses include legal fees, account

---

[14]    Identity Theft Resource Center, *2022 Consumer Impact Report*, available at https://www.idtheftcenter.org.

restoration costs, and other out-of-pocket expenses such as postage, phone calls, or time off work to repair the damage.[15]

204.    Plaintiffs and Class Members are particularly concerned about the exposure of Social Security numbers, which serve as a critical key for identity verification across the U.S. financial and governmental systems. Once exposed, a Social Security number becomes a lifelong vulnerability.

205.    Victims cannot simply replace their Social Security numbers. The Social Security Administration (SSA) has emphasized that a new number does not erase the consequences of identity theft, as existing records—including those held by the IRS, credit bureaus, and state agencies—remain linked to the compromised number.[16]

206.    The SSA has further warned that changing a Social Security number is rarely a complete remedy, stating: "A new number probably won't solve all your problems," particularly when other personal data such as names and addresses remain unchanged.[17] This leaves breach victims with no meaningful path to fully protect themselves.

207.    The threat landscape is only worsening. According to the Identity Theft Resource Center, the U.S. experienced a record 1,862 reported data breaches in 2021, marking a 68% increase over 2020. This surge has been followed by growing trends in ransomware and social engineering attacks, enabled by preventable vulnerabilities such as poor system configuration, human error, and unpatched software.[18]

---

[15]    Bureau of Justice Statistics, *Victims of Identity Theft, 2016*, U.S. Department of Justice (NCJ 251147).

[16]    Soc. Sec. Admin., *Can I Change My Social Security Number?*, SSA FAQ, https://faq.ssa.gov/en-us/Topic/article/KA-01981.

[17]    *Id.*

[18]    Identity Theft Resource Center, *2021 Annual Data Breach Report*, https://www.idtheftcenter.org/post/identity-theft-resource-center-2021-annual-data-breach-report-sets-new-record-for-number-of-compromises/

208.    High-profile data breaches at major corporations in recent years have demonstrated that companies holding large volumes of sensitive consumer data are increasingly attractive targets for cybercriminals.

209.    In September 2023, Microsoft disclosed that its AI research team inadvertently exposed 38 terabytes of internal data—including passwords, private keys, and internal Teams messages—through a misconfigured Azure cloud storage container.[19]  The breach occurred due to an overly permissive Shared Access Signature (SAS) token that allowed full access to the exposed data.

210.    Likewise, in July 2023, Estée Lauder was the victim of two ransomware attacks in which threat actors accessed and exfiltrated over 131 GB of corporate data, including email archives and sensitive business files.[20]  The incident was linked to the MOVEit file transfer vulnerability exploited globally throughout 2023.

211.    These and similar breaches should have placed Coinbase on heightened notice that any company aggregating sensitive PII—particularly in the financial and crypto sectors—is at significant risk of being targeted.  As one of the world's largest digital asset exchanges, Coinbase knew or should have known that it was operating in a high-threat environment and was therefore obligated to implement and maintain best-in-class cybersecurity measures to protect its users' data.

212.    Federal law enforcement, including the FBI and U.S. Secret Service, has issued repeated warnings to businesses regarding the rise of ransomware and data exfiltration schemes.

---

[19]    Ravie Lakshmanan, *Microsoft AI Researchers Accidentally Expose 38TB of Private Data via GitHub*, THE HACKER NEWS (Sept. 18, 2023), https://thehackernews.com/2023/09/microsoft-ai-researchers-accidentally.html.

[20]    Scott Ikeda, *Two Ransomware Gangs Hack Beauty Giant Estée Lauder, Leaking 131 GB via a MOVEit Data Breach*, CPO MAGAZINE (July 25, 2023), https://www.cpomagazine.com/cyber-security/two-ransomware-gangs-hack-beauty-giant-estee-lauder-leaking-131-gb-via-a-moveit-data-breach.

These agencies stress the importance of preventive defense and incident response preparedness for organizations that handle personal data.[21]

213.    As explained by the FBI, ransomware is a form of malicious software that encrypts or steals data and demands payment to restore access.  The FBI strongly advises against paying ransom, as it rarely results in full data recovery and instead incentivizes further criminal activity.[22] The agency emphasizes the need for strong preventive measures, including encryption, security audits, and staff training.

214.    Despite widespread awareness of cybersecurity threats and its own role as a financial data custodian, Coinbase failed to take appropriate precautions to secure Plaintiffs' and Class Members' PII.  The company reportedly stored sensitive data in a manner that was either not properly encrypted or was inadequately protected, thereby enabling unauthorized access during the breach. Because the data may not have been encrypted and Coinbase failed to offer credit monitoring or other post-breach remediation measures, these omissions reflect a reckless disregard for user security and constitute a violation of Coinbase's legal and ethical obligations.[23]

215.    Coinbase's decision to entrust account-recovery and data-handling functions to third parties including TaskUs, despite repeated warnings and known deficiencies, exemplifies this reckless disregard for cybersecurity obligations.  The resulting insider misconduct in 2025 underscores the foreseeable nature of these risks.

---

[21]     U.S. Secret Serv. & Fed. Bureau of Investigation, *Ransomware Trends and Mitigation* (Joint Advisory, 2021), https://www.cisa.gov/sites/default/files/publications/ransomware-advisory-2021.pdf.
[22]     Fed. Bureau of Investigation, *Ransomware: What It Is and What to Do About It*, https://www.fbi.gov/investigate/cyber/ransomware.
[23]     Owen Hughes, *Coinbase Says Data Stolen by Rogue Support Agent in Ransom Attempt*, TECHREPUBLIC (May 2025), https://www.techrepublic.com/article/news-coinbase-data-breach/.

### E. The Value of Personal Information and the Consequences of Unauthorized Disclosure

216.    At all relevant times, Coinbase was well aware that the personal information it collected from Plaintiffs and Class Members, including names, contact information, partial Social Security numbers, bank account details, and government-issued ID images—was highly sensitive and valuable to cybercriminals.

217.    PII is a valuable commodity in illicit markets.  The FTC has recognized that identity thieves can use PII to commit a wide array of crimes, including credit and bank fraud, tax fraud, medical identity theft, and government benefits fraud.[24]  Stolen PII is routinely bought and sold on the dark web, often in bulk, and can be reused for years to perpetrate identity-based crimes.

218.    The consequences of Coinbase's failure to safeguard Plaintiffs' and Class Members' PII are long-lasting and severe.  Once compromised, this information cannot be "returned" or fully protected.  Victims often face fraud risks for years following a breach, as identity thieves delay use of stolen data or circulate it over time in criminal marketplaces.

219.    Studies show that approximately 21% of identity theft victims are unaware their information has been misused until two years or more after the compromise, underscoring the extended danger period victims face.[25]  In many cases, victims only discover the theft when they receive debt collection notices, erroneous medical bills, or denials of credit.

220.    Unlike many companies responding to similar breaches, Coinbase did not offer identity theft protection services or credit monitoring to affected individuals.  This failure places the burden squarely on Plaintiffs and Class Members to detect and respond to fraudulent activity—activity caused by Coinbase's own data security failures.

---

[24]    16 C.F.R. § 603.2(a)–(b) (2023).
[25]    *2021 Identity Fraud Study: Shifting Angles*, JAVELIN STRATEGY & RESEARCH,  (Mar. 23, 2021), https://javelinstrategy.com/research/2021-identity-fraud-study-shifting-angles.

221.    Coinbase's lack of post-breach support is especially inadequate given the severity of the breach and the long-term nature of the risks.  Even if such services had been offered, short-term monitoring is insufficient to protect against the enduring exposure to fraud that follows the compromise of immutable identifiers like Social Security numbers and government-issued IDs.

222.    As a result, Plaintiffs and Class Members are left without meaningful tools to mitigate the threat of identity theft, and without compensation for the time, money, and emotional distress they will continue to endure in attempting to safeguard their financial lives.

223.    The injuries sustained by Plaintiffs and Class Members were directly and proximately caused by Coinbase's failure to implement and maintain reasonable and appropriate data security measures.  Coinbase's misconduct has exposed Plaintiffs and Class Members to a foreseeable, substantial, and continuing risk of harm.

224.    Plaintiffs' injuries were exacerbated by Coinbase's reliance on TaskUs.  The vendor's unauthorized access and data exfiltration directly exposed Plaintiffs' Private Information to misuse, magnifying the risk of identity theft and financial loss.

### F. Coinbase Failed to Comply with FTC Data Security Standards

225.    Coinbase's handling of users' personal information failed to meet the standards set forth by the FTC for businesses that collect and store sensitive consumer data.  Under the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §45, companies are prohibited from engaging in "unfair or deceptive acts or practices in or affecting commerce."  The FTC has consistently held that a company's failure to implement reasonable and appropriate data security measures for consumer information constitutes an "unfair practice" under Section 5 of the FTC Act.[26]

---

[26]    15 U.S.C. §45(a)(1); *see also* Fed. Trade Comm'n, *Privacy & Security Enforcement: Data Security*, https://www.ftc.gov/business-guidance/privacy-security/data-security (last visited May 16, 2025).

226.    The FTC has issued extensive guidance emphasizing that data security must be a core consideration in all business operations that involve consumer data.  In particular, the FTC expects companies to adopt security measures appropriate to the sensitivity of the data they collect, and to continually evaluate and address emerging threats and vulnerabilities.

227.    In 2016, the FTC published Protecting Personal Information: A Guide for Business, which outlines specific practices that companies should follow to secure customer data.  These include encrypting information stored on company networks, properly disposing of data no longer needed, understanding and mitigating network vulnerabilities, and developing and enforcing written information security policies.[27]

228.    The FTC also advises companies to avoid retaining sensitive information longer than necessary, limit internal access to private data, require the use of complex passwords and multi-factor authentication, regularly monitor networks for suspicious activity, and ensure that third-party vendors implement comparable security standards.

229.    The FTC has brought numerous enforcement actions against companies that failed to meet these expectations.  In *FTC v. Wyndham Worldwide Corp.*, for example, the Third Circuit upheld the FTC's authority to penalize companies that do not take reasonable steps to secure consumer information.[28]  These enforcement actions confirm that neglecting to safeguard sensitive personal data—particularly when it leads to a breach—is a recognized violation of federal law.

230.    Coinbase's failure to implement and maintain reasonable security measures— despite collecting highly sensitive personal and financial information from millions of users—falls squarely within the scope of the FTC's enforcement authority.  Its conduct constituted an unfair

---

[27]    Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.
[28]    *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 245–47 (3d Cir. 2015).

practice that exposed Plaintiffs and Class Members to a foreseeable and preventable risk of identity theft and fraud.

## V. REPRESENTATIVE PLAINTIFFS' COMMON EXPERIENCES

231.    Coinbase collected and stored highly sensitive personal information from Plaintiffs and Class Members—including names, mailing addresses, email addresses, bank account information, Social Security numbers, and government-issued identification—as a condition of using its cryptocurrency trading and custody platform. Coinbase was entrusted with this data based on an expectation that it would maintain industry-standard protections.

232.    Plaintiffs and Class Members reasonably expected that Coinbase would take adequate steps to protect their personal information from unauthorized access. The decision to open and maintain accounts with Coinbase was predicated, in part, on Coinbase's representations and public-facing policies concerning the security of user data.

233.    Coinbase's failure to implement reasonable data security measures deprived Plaintiffs and Class Members of the benefit of their bargain. In exchange for providing sensitive personal information and transacting through Coinbase's platform, users expected that their data would be securely stored.

234.    The cybercriminals responsible for the May 2025 data breach targeted Coinbase precisely because of the volume and sensitivity of its user data. That stolen information—already confirmed to include identifying details and government ID images—now places—Plaintiffs and Class Members at a persistent and elevated risk of identity theft, fraud, and future economic loss.

235.    Data of this kind is routinely sold on dark web marketplaces, where buyers use it to engage in various forms of fraud. Once sold, this data may be repeatedly resold, repackaged, and combined with other breached datasets to enhance its utility for malicious actors.

236.    With access to the PII compromised in the breach, identity thieves can:

    a.  Obtain employment under false pretenses;

    b.  Apply for and secure loans in the victim's name;

    c.  Open credit card accounts or use credentials for fraudulent purchases;

    d.  File false tax returns and claim refunds;

    e.  Steal government benefits, including unemployment or Social Security payments; and

    f.  Apply for driver's licenses, passports, or other government-issued IDs using stolen credentials.

237.    In more severe cases, criminals may use a Class Member's stolen Social Security number and personal information to create false identities used in the commission of crimes.  This can lead to wrongful criminal records being created in victims' names, complicating future background checks, employment, housing, and loan approvals.

238.    The long-term risk is especially acute because PII has a long "shelf life."  It is not easily changeable and can be used indefinitely across multiple platforms and sectors.  Because identity theft often takes months or years to detect, victims remain vulnerable long after the initial breach.

## VI.    CLASS ALLEGATIONS

239.    Plaintiffs bring this class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(a) and (b)(2) and (b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Nationwide Class") and subclasses (the "State Subclasses") (collectively, the "Class"):

**Nationwide Class:** All persons within the United States and its territories whose Private Information was maintained by Coinbase and was exfiltrated by unauthorized third parties in the Data Breach.

**California Subclass:** All persons in the state of California whose Private Information was maintained by Coinbase and was exfiltrated by unauthorized third parties in the Data Breach.

**Colorado Subclass:** All persons in the state of Colorado whose Private Information was maintained by Coinbase and was exfiltrated by unauthorized third parties in the Data Breach.

**Maine Subclass:** All persons in the state of Maine whose Private Information was maintained by Coinbase and was exfiltrated by unauthorized third parties in the Data Breach.

**Massachusetts Subclass:** All persons in the state of Massachusetts whose Private Information was maintained by Coinbase and was exfiltrated by unauthorized third parties in the Data Breach.

**New York Subclass:** All persons in the state of New York whose Private Information was maintained by Coinbase and was exfiltrated by unauthorized third parties in the Data Breach.

**South Carolina Subclass:** All persons in the state of South Carolina whose Private Information was maintained by Coinbase and was exfiltrated by unauthorized third parties in the Data Breach.

**Texas Subclass:** All persons in the state of Texas whose Private Information was maintained by Coinbase and was exfiltrated by unauthorized third parties in the Data Breach.

**Washington Subclass:** All persons in the state of Washington whose Private Information was maintained by Coinbase and was exfiltrated by unauthorized third parties in the Data Breach.

**Wisconsin Subclass:** All persons in the state of Wisconsin whose Private Information was maintained by Coinbase and was exfiltrated to unauthorized third parties in the Data Breach.

240.    Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers, and directors, current or former employees, and subcontractor used by Defendants in performing its duties; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments,

agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

241.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate, including but not limited subclasses and/or state-specific classes depending on evidence and information learning during discovery.

242.    **Numerosity, Fed R. Civ. P. 23(a)(1):** The Class is so numerous that joinder of all members is impracticable.  The Class includes thousands of individuals whose Private Information may have been improperly accessed in the Data Breach.

243.    **Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3):** Questions of law and fact common to the Class predominate over any questions affecting only individual Class Members. These include:

a.    Whether and when Defendants actually learned of the Data Breach and whether its response was adequate;

b.    Whether Defendants owed a duty to the Class to exercise due care in collecting, storing, safeguarding and/or obtaining their Private Information;

c.    Whether Defendants breached that duty;

d.    Whether Defendants implemented and maintained reasonable security procedures and practices appropriate to the nature of storing Plaintiffs' and Class Members' Private Information;

e.    Whether Defendants acted negligently in connection with the monitoring and/or protecting of Plaintiffs' and Class Members' PII;

f.    Whether Defendants knew or should have known that it did not employ

reasonable measures to keep Plaintiffs' and Class Members' PII secure and prevent loss or misuse of that Private Information;

g.  Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

h.  Whether Defendants caused Plaintiffs' and Class Members' damages;

i.  Whether Defendants violated the law by failing to promptly notify Class Members that their Private Information had been compromised;

j.  Whether Plaintiffs and the other Class Members are entitled to actual damages, credit monitoring, and other monetary relief;

k.  Whether Defendants violated common law and statutory claims alleged herein

244.  **Typicality, Fed. R. Civ. P. 23(a)(3):** Plaintiffs' claims are typical of those of other Class Members, because all had their Private Information compromised as a result of the Data Breach, due to Defendants' misfeasance.

245.  **Adequacy, Fed. R. Civ. P. 23(a)(4):** Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that she has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously.

246.  **Superiority and Manageability, Fed. R. Civ. P. 23(b)(3):** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action

treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those class members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

247.    The nature of this action and the nature of laws available to Plaintiffs and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the Class for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since Defendants would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is similar to that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

248.    The litigation of the claims brought herein are manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

249.    Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

250.    **Predominance, Fed. R. Civ. P. 23(b)(3):** The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.  Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members.  The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues.  Adjudication of these issues in a single action has important and desirable advantages of judicial economy.

251.    **Alternative Issue-Class Certification Under Rule 23(c)(4):** In the alternative, Plaintiffs seek certification of one or more issue classes under Federal Rule of Civil Procedure 23(c)(4).  Even if individualized questions regarding damages or entitlement to certain forms of relief were to preclude certification of the entire action under Rule 23(b)(3), certification would nevertheless be appropriate for the common issues that predominate, including: (1) whether Defendants owed and breached duties to safeguard Private Information; (2) whether Defendants' conduct was negligent or otherwise unlawful; (3) whether Defendants' acts and omissions proximately caused the Data Breach; and (4) whether Defendants' uniform policies, practices, and failures to supervise vendors such as TaskUs were a substantial factor in causing the Data Breach and resulting harm.  Certification of these issues on a class wide basis will materially advance this litigation, promote judicial economy, and avoid the risk of inconsistent adjudications concerning Defendants' uniform conduct.

## VII.    CHOICE OF LAW FOR NATIONWIDE CLAIMS

252.    The State of New York has a significant interest in regulating the conduct of businesses operating within its borders.  New York, which seeks to protect the rights and interests

of New York and all residents and citizens of the United States against a company headquartered and doing business in New York, has a greater interest in the nationwide claims of Plaintiffs and Nationwide Class Members than any other state and is most intimately concerned with the claims and outcome of this litigation.

253.    The principal place of business of Coinbase is located at One Madison Avenue, New York, New York 10010.  Therefore, New York is the "nerve center" of Coinbase's business activities—the place where its high-level officers direct, control, and coordinate the corporation's activities, including its data security functions and major policy, financial, and legal decisions.

254.    Coinbase's and TaskUs's response to the data breach at issue here, and corporate decisions surrounding such response, were made from and in New York.  Furthermore, Coinbase accepted its duties to Plaintiffs and the Class and the Subclasses in New York; stored the data subject to the breach in New York; and provided and/or performed most, if not all, services in New York.

255.    Coinbase's breaches of duty to Plaintiffs and Nationwide Class Members emanated from New York.  New York is the state in which the injury occurred and, therefore, New York's law is applicable to, at a minimum, the nationwide causes of action.  The fact that the results of the injury were felt or the damages manifested in a different state is not dispositive.

256.    Under New York's choice-of-law principles, which are applicable to this action, the common law of New York applies to the nationwide common-law claims of all Nationwide Class Members.

## VIII. COINBASE'S ARBITRATION, DISCLAIMER, AND LIMITATION-OF-LIABILITY CLAUSES ARE UNCONSCIONABLE UNDER NEW YORK LAW AND UNENFORCEABLE

257.    Coinbase's User Agreement (the "Agreement") contains an arbitration clause, a New York choice-of-law clause, and broad disclaimers and limitations of liability that purport to shield Coinbase from virtually all responsibility for damages—including consequential, incidental, punitive, or data-loss harms arising from its own negligence or statutory violations.[29]

258.    Coinbase requires consumers to create an account before using its platform.  During this process, users must provide extensive personal and identifying information—including full name, email address, phone number, and the last four digits of their Social Security number.  Users are also required to upload front-and-back photographs of a government-issued identification card to verify their identity.[30]

259.    Throughout this onboarding process, users are not shown any contract language or terms of use.  Coinbase collects this personal and identifying information before displaying or referencing any User Agreement, Terms of Use, or arbitration provision.

260.    After completing identity verification, users receive an email from Coinbase containing a link to access their newly created account.  At no stage in this process are users required to affirmatively accept or acknowledge any terms of service or arbitration clause.

261.    Coinbase's current User Agreement is accessible only through a hyperlink located on its website and states that "by creating a Coinbase account or otherwise accessing or using Coinbase Services, you agree to be bound by this User Agreement."[31]  Users who complete account

---

[29]     Coinbase User Agreement §8 ("Limitation of Liability"); Appendix 5 ("Arbitration Agreement and Waiver of Class Action"), https://www.coinbase.com/legal/user_agreement/united_states

[30]     Coinbase, *Sign Up*, https://www.coinbase.com/ (last visited Oct. 21, 2025).

[31]     Coinbase, *User Agreement (United States)* §1 (September 2025), https://www.coinbase.com/legal/user_agreement/united_states ("*Coinbase User Agreement*").

creation and identity verification are not prompted to click an "I Agree" button or otherwise manifest assent to the terms referenced by hyperlink.

262.    The User Agreement is a lengthy online document exceeding 16,000 words.  The arbitration and class-action waiver provisions appear in Appendix 5, located at the very end of the document, several screens below the primary sections describing Coinbase's products and services.[32]

263.    The User Agreement also contains a limitation-of-liability clause stating that Coinbase "shall not be liable for any indirect, incidental, special, consequential, or punitive damages, or any loss of profits, revenues, or data."[33]

264.    Coinbase may revise the User Agreement at any time and provides that continued use of its services constitutes acceptance of the revised terms.[34]

265.    Plaintiffs did not view, receive, or affirmatively agree to the User Agreement, arbitration provision, or limitation-of-liability clause at any time before or during the account-creation process.

266.    Coinbase nevertheless maintains that consumers are bound by these terms when creating or accessing their accounts, even though the relevant provisions are not displayed or affirmatively accepted during registration.

267.    As a result, Coinbase obtained Plaintiffs' personal and identifying information through this registration process before securing any agreement governing its collection, storage, or protection.

---

[32]    *Coinbase User Agreement*, app. 5.
[33]    *Id*.
[34]    *Id.*

## CAUSES OF ACTION

### COUNT 1
### NEGLIGENCE (INCLUDING *NEGLIGENCE PER SE*)
### (On Behalf of Plaintiffs and the Nationwide Class, or Alternatively, on Behalf of Plaintiffs and the State Subclasses)

268.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

269.    Defendants' clients required Plaintiffs and the other Class and Subclass Members to submit non-public personal information in order to make charitable contributions to non-profit organizations, and/or obtain medical, educational, and other services.  Defendants had a duty to Class and Subclasses Members to securely maintain the Private Information collected as promised and warranted.

270.    By voluntarily accepting the duty to maintain and secure this data, and sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and safeguard its computer systems—and Class and Subclass' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from cyber theft. Defendants' duty included a responsibility to implement systems and processes by which it could detect and prevent a breach of its security systems in an expeditious manner and to give prompt notice to those affected by a data breach and/or ransomware attack.

271.    Defendants owed a duty of care to Plaintiffs, Class, and Subclasses Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected and safeguarded the Private Information of the Class and Subclasses.

272.    Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and Class and Subclasses Members, the

end users of the services Defendants provided to their clients, which is recognized by Defendants' Privacy Policy, as well as applicable laws and regulations. Defendants actively solicited Private Information as part of its business and were in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class and Subclasses Members from a ransomware attack and resulting data breach.

273.    In particular, Coinbase delegated core account-recovery and customer-authentication functions to TaskUs, whose overseas employees were granted access to vast amounts of customer data with minimal supervision. Coinbase failed to monitor TaskUs's data-handling practices or restrict its personnel's access to confidential information. TaskUs employees' misconduct in 2021 and 2025 directly resulted in the compromise and exfiltration of Plaintiffs' personal data. These acts and omissions constitute breaches of Defendants' duties of reasonable care.

274.    Pursuant to the FTC Act, 15 U.S.C. §45, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class and Subclasses Members' Private Information.

275.    Pursuant to the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. §6801, Defendants had a duty to protect the security and confidentiality of Plaintiffs' and the other Class and Subclasses Members' Private Information.

276.    Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

277.    Defendants' statutory duties to maintain reasonable data security are established by federal law, including the FTC Act, and the GLBA. These laws require businesses that collect

consumers' personal information to implement and maintain reasonable security measures to protect that information from unauthorized access or disclosure.

278. Defendants' failure to comply with these legal standards constitutes *negligence per se,* as their conduct violated statutory duties designed to prevent the type of harm suffered by Plaintiffs and the Class. These statutory violations are further evidence of Defendants' breach of their duty of care.

279. Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect the Class and Subclasses members' data. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

   a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class and Subclass Members' Private Information;

   b. Failing to adequately monitor the security of its networks and systems;

   c. Failure to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

   d. Allowing unauthorized access to Class Members' Private Information;

   e. Failing to detect in a timely manner that Class and Subclass Members' Private Information had been compromised; and

   f. Failing to timely notify Class and Subclass Members about the Data Breach so those put at risk could take timely and appropriate steps to mitigate the potential for identity theft and other damages.

280. It was foreseeable that Defendants' failure to use reasonable measures to protect Class and Subclasses Members' Private Information would result in injury to Class members. Further, the breach of security was reasonably foreseeable given the known high frequency of ransomware attacks and data breaches.

281.    It was therefore foreseeable that the failure to adequately safeguard Class and Subclass Members' Private Information would result in one or more types of injuries to Class and Subclasses Members.

282.    Plaintiffs are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

283.    Plaintiffs are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide robust and adequate credit monitoring to all Class Members, and any other relief this Court deems just and proper.

## COUNT 2
## GROSS NEGLIGENCE
**(On Behalf of Plaintiffs and the Nationwide Class, or Alternatively, on Behalf of Plaintiffs and the State Subclasses)**

284.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

285.    Plaintiffs and the Class and Subclass Members entrusted Defendants with their highly sensitive, non-public Private Information—including names, addresses, Social Security numbers, driver's license numbers, financial account information, and cryptocurrency account credentials—as a condition of creating, maintaining, and using accounts on the Coinbase platform.

286.    By voluntarily collecting, storing, and profiting from Plaintiffs' and the Class and Subclass Members' Private Information, Defendants owed a duty of care to use reasonable and industry-standard means to secure and safeguard their computer systems, detect unauthorized access, and prevent disclosure of Private Information.

287.    Defendants' duty included a responsibility to implement systems and processes that would timely detect and prevent intrusions into their data environment, and to promptly notify Plaintiffs and the Class and Subclass Members when a breach occurred, so that they could mitigate identity theft and fraud.

288.    Defendants' duty of care to provide reasonable security measures arose from the special relationship between Defendants and Plaintiffs and the Class and Subclass Members, who were required to entrust Defendants with sensitive financial and identifying data to use Defendants' services, and who had no ability to protect themselves against data security failures within Defendants' systems.

289.    Pursuant to the FTC Act, 15 U.S.C. §45, Defendants had a duty to implement and maintain reasonable data security practices to safeguard Plaintiffs' and the Class and Subclass Members' Private Information.

290.    Pursuant to the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. §6801, Defendants had a duty to protect the security and confidentiality of Plaintiffs' and Subclass Members' Private Information.

291.    Defendants' duty to use reasonable care also arose from industry standards and common law principles requiring entities that collect and profit from consumers' sensitive financial and personal data to implement adequate safeguards.

292.    Defendants consciously disregarded these duties and acted with gross negligence by failing to take reasonable measures to secure Private Information, despite knowing of the high likelihood of cyberattacks against financial institutions and cryptocurrency exchanges.

293.    The specific grossly negligent acts and omissions committed by Defendants include, but are not limited to:

a. Consciously failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Subclass Members' Private Information;

b. Consciously failing to adequately monitor the security of their networks and systems for intrusions;

c. Consciously failing to implement adequate authentication, encryption, and intrusion-detection systems consistent with industry standards;

d. Consciously permitting unauthorized access to Class and Subclass Members' Private Information;

e. Consciously failing to detect, in a timely manner, that Plaintiffs' and Subclass Members' Private Information had been compromised;

f. Consciously failing to timely notify Plaintiffs and Subclass Members about the Data Breach so they could take appropriate steps to mitigate identity theft and fraud; and

g. Consciously failing to oversee and supervise vendors, including TaskUs, that maintained or processed consumer data on Defendants' behalf.

294. It was foreseeable that Defendants' conscious failure to use reasonable measures to protect the Data Breach Subclass Members' Private Information would result in injury, including identity theft, fraud, financial losses, and loss of privacy.

295. The breach of security was reasonably foreseeable given the known high frequency of ransomware attacks and data breaches targeting financial institutions and cryptocurrency platforms.

296. Plaintiffs and the Data Breach Subclass are entitled to compensatory and consequential damages suffered as a result of Defendants' gross negligence.

297. Plaintiffs and the Data Breach Subclass are also entitled to injunctive relief requiring Defendants to: (i) strengthen their data security systems and monitoring procedures; (ii) submit to annual third-party audits of those systems and procedures; (iii) implement vendor oversight measures ensuring that contractors like TaskUs maintain industry-standard safeguards;

and (iv) provide robust credit monitoring and identity theft protection services to all affected Subclass Members, along with any other relief this Court deems just and proper.

**COUNT 3**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Nationwide Class,**
**or Alternatively, on Behalf of Plaintiffs and the State Subclasses)**

298.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

299.     When Plaintiffs and the other Class and Subclass Members provided their Private Information to Defendants and Defendants' clients in exchange for Defendants and Defendants' clients' services, they entered into implied contracts with Defendants pursuant to which Defendants agreed to reasonably protect such information.

300.     Defendants solicited and invited Class Members to provide their Private Information as part of Defendants' regular business practices, including through its Privacy Policy. Plaintiffs and the other Class and Subclass Members accepted Defendants' offers and provided their data to Defendants.

301.     In entering into such implied contracts, Plaintiffs and the other Class and Subclass Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations and were consistent with industry standards.

302.     Plaintiffs and the other Class and Subclass Members would not have entrusted their Private Information to Defendants in the absence of the implied contract between them and Defendants to keep that information secure.  Plaintiffs and the other Class and Subclass Members would not have entrusted their Private Information to Defendants in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

303.     Plaintiffs and the other Class and Subclass Members fully and adequately performed their obligations under the implied contracts with Defendants.

304.     Defendants breached their implied contracts with Plaintiffs and the other Class and Subclass Members by failing to safeguard and protect their data.

305.     As a direct and proximate result of Defendants' breaches of the implied contracts, Plaintiffs and the other Class and Subclass Members sustained damages as alleged herein.

306.     Plaintiffs and the other Class and Subclass Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

307.     Plaintiffs and the other Class and Subclass Members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class and Subclass Members.

**COUNT 4**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiffs and the Nationwide Class,**
**or Alternatively, on Behalf of Plaintiffs and the State Subclasses)**

308.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

309.     In light of the special relationship between Coinbase and Representative Plaintiffs and Class Members, whereby Coinbase became the guardian of Representative Plaintiffs' and Class Members' PII, Coinbase became a fiduciary by its undertaking and guardianship of the PII to act primarily for Representative Plaintiffs and Class Members, (i) for the safeguarding of Representative Plaintiffs' and Class Members' PII, (ii) to timely notify Representative Plaintiffs and Class Members of a data breach and disclosure, and (iii) to maintain complete and accurate records of what information (and where) Coinbase did have and continues to store.

310.    Coinbase has a fiduciary duty to act for the benefit of Representative Plaintiffs and Class Members upon matters within the scope of its relationship with its customers' patients and former patients—in particular, to keep their PII secure.

311.    Coinbase breached its fiduciary duties to Representative Plaintiff and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period of time.

312.    Coinbase breached its fiduciary duties to Representative Plaintiffs and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Representative Plaintiffs' and Class Members' PII.

313.    Coinbase breached its fiduciary duties to Representative Plaintiffs and Class Members by failing to timely notify and/or warn Representative Plaintiffs and Class Members of the Data Breach.

**COUNT 5**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiffs and the Nationwide Class,**
**or alternatively, On Behalf of Plaintiffs and the State Subclasses)**

314.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

315.    Under the Declaratory Judgment Act, 28 U.S.C. §§2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief.  Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

316.    An actual controversy has arisen in the wake of the Coinbase data breach regarding its present and prospective common law and other duties to reasonably safeguard its customers' Private Information and whether Coinbase is currently maintaining data security measures

adequate to protect Plaintiffs and Class and Subclasses Members from further data breaches that compromise their Private Information.  Plaintiffs allege that Coinbase's data security measures remain inadequate.  Coinbase denies these allegations.  Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their Private Information and remain at imminent risk that further compromises of their Private Information will occur in the future.

317.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

      a.  Coinbase continues to owe a legal duty to secure consumers' Private Information and to timely notify consumers of a data breach under the common law, the FTC, the GLBA, HIPAA and various state statutes;

      b.  Coinbase continues to breach this legal duty by failing to employ reasonable measures to secure consumers' Private Information.

318.    The Court also should issue corresponding prospective injunctive relief requiring Coinbase to employ adequate security protocols consistent with law and industry standards to protect consumers' Private Information.

319.    If an injunction is not issued, Plaintiffs will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Coinbase.  The risk of another such breach is real, immediate, and substantial.  If another breach at Coinbase occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

320.    The hardship to Plaintiffs if an injunction does not issue exceeds the hardship to Coinbase if an injunction is issued.  Among other things, if another massive data breach occurs at Coinbase, Plaintiffs will likely be subjected to substantial identify theft and other damage.  On the other hand, the cost to Coinbase of complying with an injunction by employing reasonable

prospective data security measures is relatively minimal, and Coinbase has a pre-existing legal obligation to employ such measures.

321.    Issuance of the requested injunction will not disserve the public interest.  To the contrary, such an injunction would benefit the public by preventing another data breach at Coinbase, thus eliminating the additional injuries that would result to Plaintiffs and the millions of consumers whose Personal Information would be further compromised.

## COUNT 6
## UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Nationwide Class Subclass,
### or Alternatively, on Behalf of Plaintiffs and the State Subclasses)

322.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

323.    Plaintiffs and the Class and Subclasses Members have an interest, both equitable and legal, in the Private Information about them that was conferred upon, collected by, and maintained by Defendants and that was ultimately stolen in the Coinbase data breach.

324.    Coinbase and TaskUs were benefitted by the conferral upon it of the Private Information pertaining to Plaintiffs and Class and Subclasses Members and by their ability to retain and use that information.  Coinbase and TaskUs understood that they were in fact so benefitted.

325.    Coinbase and TaskUs also understood and appreciated that the Private Information pertaining to Plaintiffs and Class and Subclasses Members was private and confidential and its value depended upon Defendants maintaining the privacy and confidentiality of that Personal Information.

326.    But for Defendants' willingness and commitment to maintain its privacy and confidentiality, that Private Information would not have been transferred to and entrusted with Coinbase and TaskUs.  Further, if Defendants had disclosed that their data security measures were

inadequate, Coinbase and TaskUs would not have been permitted to continue in operation by regulators and participants in the marketplace.

327.     As a result of Defendants' wrongful conduct as alleged in this Complaint (including among other things, its utter failure to employ adequate data security measures, its continued maintenance and use of the Private Information belonging to Plaintiffs and Class and Subclasses Members without having adequate data security measures, and its other conduct facilitating the theft of that Private Information), Coinbase and TaskUs have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and Class and Subclasses Members.  Among other things, Defendants continue to benefit and profit from the sale of the Private Information while its value to Plaintiffs and Class and Subclasses Members has been diminished.

328.     Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiffs' and Class and Subclasses Members' sensitive Private Information, while at the same time failing to maintain that information secure from intrusion and theft by hackers and identity thieves.

329.     Under the common law doctrine of unjust enrichment, it is inequitable for Coinbase and TaskUs to be permitted to retain the benefits they received, and are still receiving, without justification, from Plaintiffs and Class and Subclasses Members in an unfair and unconscionable manner.  Defendants' retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

330.     The benefit conferred upon, received, and enjoyed by Coinbase and TaskUs was not conferred officiously or gratuitously, and it would be inequitable and unjust for Defendants to retain the benefit.

331.    Coinbase and TaskUs are therefore liable to Plaintiffs and Class and Subclasses Members for restitution in the amount of the benefit conferred on Defendants as a result of its wrongful conduct, including specifically the value to Defendants of the Private Information that was stolen in the Coinbase data breach and the profits Defendants are receiving from the use and sale of that information.

**COUNT 7**
**CALIFORNIA CUSTOMER RECORDS ACT,**
**Cal. Civ. Code §§1798.80, *et seq.* ("CCRA")**
**(On Behalf of the California Plaintiffs and the California Subclass)**

332.    Plaintiffs Balian, Carmassi, Edlin, Eisenberg, Grove, McAfee, and Scheuber ("California Plaintiffs") re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

333.    At all relevant times, Defendant Coinbase collected, stored, and controlled Plaintiffs' and Class Members' Personal Information, as Defined by Cal. Civ. Code §1798.80, *et seq.* ("Personal Information" as used in this Count), in connection with its cryptocurrency exchange platform.  Defendant TaskUs, acting as a vendor and agent of Coinbase, provided customer support, account management, and data processing services, during which it received, maintained, and processed Plaintiffs' and Class Members' Personal Information.  By providing these services to Coinbase consumers in California, TaskUs engaged in "business" within the meaning of Cal. Civ. Code §§1798.80–1798.82.  Both Coinbase and TaskUs are "businesses" subject to the CCRA.

334.    "[T]o ensure that Personal Information about California residents is protected," the California legislature enacted Cal. Civ. Code §1798.81.5, which requires that any business that "owns, licenses, or maintains Personal Information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the

information, to protect the Personal Information from unauthorized access, destruction, use, modification, or disclosure."

335.    Defendants Coinbase and TaskUs are businesses that own, maintain, and license Personal Information, within the meaning of Cal. Civ. Code §1798.81.5, about Plaintiffs and California Subclass Members.

336.    Businesses that own or license computerized data that includes Personal Information, including Social Security numbers, are required to notify California residents when their Personal Information has been acquired (or is reasonably believed to have been acquired) by unauthorized persons in a data security breach "in the most expedient time possible and without unreasonable delay." Cal. Civ. Code §1798.82. Among other requirements, the security breach notification must include "the types of Personal Information that were or are reasonably believed to have been the subject of the breach." Cal. Civ. Code §1798.82.

337.    Coinbase and TaskUs are businesses that own or license computerized data that includes Personal Information as defined by Cal. Civ. Code §1798.82.

338.    Plaintiffs and California Subclass Members' Personal Information (e.g., Social Security numbers) include Personal Information as covered by Cal. Civ. Code §1798.82.

339.    Because Defendants reasonably believed that Plaintiffs' and California Subclass Members' Personal Information was acquired by unauthorized persons during the Coinbase data breach, Defendants had an obligation to disclose the Coinbase data breach in a timely and accurate fashion as mandated by Cal. Civ. Code §1798.82.

340.    By failing to disclose the Coinbase data breach in a timely and accurate manner, Defendants violated Cal. Civ. Code §1798.82.

341.    As a direct and proximate result of Coinbase's violations of the Cal. Civ. Code §§1798.81.5 and 1798.82, Plaintiffs and California Subclass Members suffered damages, as described above.

342.    Plaintiffs and California Subclass Members seek relief under Cal. Civ. Code §1798.84, including actual damages and injunctive relief.

### COUNT 8
### CALIFORNIA CONSUMER PRIVACY ACT,
Cal. Civ. Code §§ 1798.100, *et seq.* ("CCPA")
(On Behalf of the California Plaintiffs and the California Subclass)

343.    The California Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

344.    At all relevant times, Defendant Coinbase collected, stored, and controlled Plaintiffs' and Class Members' Personal Information within the meaning of Cal. Civ. Code §§1798.81.5 ("Personal Information" as used in this Count) in connection with its cryptocurrency exchange platform.  Defendant TaskUs, acting as a vendor and agent of Coinbase, provided customer support, account management, and data processing services, during which it received, maintained, and processed Plaintiffs' and Class Members' Private Information.  By providing these services to Coinbase consumers in California, TaskUs engaged in the collection, maintenance, and processing of consumers' Personal Information.  Both Coinbase and TaskUs are "businesses" subject to the California Consumer Privacy Act, Cal. Civ. Code §1798.140(d).

345.    Defendants violated Section 1798.150 of the CCPA by failing to prevent California Plaintiffs' and the California Subclass Members' nonencrypted and nonredacted Personal Information from unauthorized access and exfiltration, theft, or disclosure as a result of Defendants' violation of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information.

346. Defendants knew or should have known that its data security practices were inadequate to secure California Subclass Members' Personal Information and that its inadequate data security practices gave rise to the risk of a data breach.

347. Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the Private Information it collected and stored.

348. Coinbase is a corporation organized and operated for profit with annual gross revenues exceeding $25 million and is therefore a "business" under the CCPA. TaskUs is also a "business" under §1798.140(d) because it processes California consumers' Personal Information on behalf of Coinbase and determines, in part, the means and purposes of such processing.

349. Plaintiffs seek injunctive relief in the form of an order requiring Defendants to employ adequate security practices consistent with law and industry standards to protect the California Subclass Members' Personal Information, requiring Defendants to complete its investigation, and to issue an amended statement giving a detailed explanation that confirms, with reasonable certainty, what categories of data were stolen and accessed without the California Subclass Members' authorization, along with an explanation of how the data breach occurred.

350. Pursuant to Cal. Civ. Code §1798.150(b), Plaintiff Carmassi provided written notice to Coinbase on June 6, 2025, identifying the specific provisions of the CCPA that Coinbase violated and giving Coinbase 30 days to cure. Coinbase responded to that notice but did not cure the violations.

351. Pursuant to the same statute, Plaintiff Eisenberg provided written notice to Coinbase on May 16, 2025, identifying the CCPA provisions violated and allowing 30 days to cure. Coinbase did not respond or cure within the statutory period.

352.    The other California Plaintiffs did not provide pre-suit notice to Coinbase under §1798.150(b).

353.    No California Plaintiff provided pre-suit notice to TaskUs.

354.    The 30-day cure period applicable to Plaintiffs Eisenberg and Carmassi has expired without cure.  Accordingly, on behalf of themselves and the California Subclass, they seek all available relief under Cal. Civ. Code §1798.150(a), including:

      a.    actual pecuniary damages or, in the alternative, statutory damages of not less than $100 and not greater than $750 per consumer per incident;

      b.    injunctive relief requiring Defendants to implement and maintain reasonable security procedures and practices consistent with law and industry standards; and

      c.    any other relief the Court deems proper.

355.    On behalf of the remaining California Plaintiffs who have not yet provided statutory notice, Plaintiffs seek injunctive and equitable relief under §1798.150(a) and reserve the right to amend this Complaint to seek statutory damages and additional relief if Defendants fail to cure the alleged violations after proper notice.

**COUNT 9**
**CALIFORNIA UNFAIR COMPETITION LAW,**
**Cal. Bus. & Prof. Code §§17200, *et seq.* ("UCL")**
**(On Behalf of the California Plaintiffs and the California Subclass)**

356.    The California Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

357.    At all relevant times, Defendant Coinbase collected, stored, and controlled Plaintiffs' and Class Members' Private Information in connection with its cryptocurrency exchange platform.  Defendant TaskUs, acting as a vendor and agent of Coinbase, provided customer support, account management, and data processing services, during which it received, maintained, and processed Plaintiffs' and Class Members' Private Information.  By providing

these services to Coinbase consumers in California, TaskUs engaged in trade and commerce within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.* Both Coinbase and TaskUs are "persons" within the meaning of Cal. Bus. & Prof. Code §17201.

358. Defendants Coinbase and TaskUs are each a "person" as defined by Cal. Bus. & Prof. Code §17201.

359. Defendants violated Cal. Bus. & Prof. Code §§ 17200, *et seq.* by engaging in unlawful and unfair business acts and practices.

360. Defendants' "unfair" acts and practices include:

a. Defendants failed to implement and maintain reasonable security measures to protect Plaintiffs and the California Subclass Members' Private Information from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Coinbase data breach. Defendants failed to identify foreseeable security risks, remediate identified security risks, and adequately improve security following previous cybersecurity incidents. For example, Defendants failed to address known and well-documented security vulnerabilities, making it trivial for unauthorized actors to penetrate Defendants' systems. This conduct, with little if any utility, is unfair when weighed against the harm to Plaintiffs and the California Subclass, whose Private Information has been compromised.

b. Defendants' failure to implement and maintain reasonable security measures also was contrary to legislatively declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected in laws, including the FTC Act, 15 U.S.C. §45, the GLBA, 15 U.S.C. §6801, *et seq.*, and California's Consumer Records Act, Cal. Civ. Code §1798.81.5.

c. Defendants' failure to implement and maintain reasonable security measures also lead to substantial consumer injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because consumers could not know of Defendants' inadequate security, consumers could not have reasonably avoided the harms that Defendants caused.

d. Engaging in unlawful business practices by violating Cal. Civ. Code §1798.82.

361. Defendants have engaged in "unlawful" business practices by violating multiple laws, including California's Consumer Records Act, Cal. Civ. Code §§1798.81.5 (requiring

reasonable data security measures) and 1798.82 (requiring timely breach notification), California's

Consumers Legal Remedies Act, Cal. Civ. Code §§1780, *et seq.*, the GLBA, 15 U.S.C. §6801, *et*

*seq.,* the FTC Act, 15 U.S.C. §45, HIPAA, 42 U.S.C. §1320d, and California common law.

362.    Defendants' unlawful, unfair, and deceptive acts and practices include:

a.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs and California Subclass Members' Private Information, which was a direct and proximate cause of the Coinbase data breach;

b.    Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Coinbase data breach;

c.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs and California Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, the GLBA, 15 U.S.C. §6801, *et seq.*, and California's Customer Records Act, Cal. Civ. Code §§1798.80, *et seq.*, which was a direct and proximate cause of the Coinbase data breach;

d.    Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs and California Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e.    Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs and California Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, the GLBA, 15 U.S.C. §6801, *et seq.*, and California's Customer Records Act, Cal. Civ. Code §§1798.80, *et seq.*;

f.    Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs and California Subclass Members' Private Information; and

g.    Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs and California Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, the GLBA, 15 U.S.C. §6801, *et seq.*, and California's Customer Records Act, Cal. Civ. Code §§1798.80, *et seq.*

363.    As a direct and proximate result of Defendants' unfair and unlawful acts and

practices, Plaintiffs and California Subclass Members were injured and lost money or property,

including monetary damages from fraud and identity theft, time and expenses related to monitoring their financial accounts for fraudulent activity, an increased, imminent risk of fraud and identity theft, and loss of value of their Private Information.

364.    Defendants acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiffs and California Subclass Members' rights. Coinbase's numerous past data breaches put it on notice that its security and privacy protections were inadequate.

365.    Plaintiffs and California Subclass Members seek all monetary and non-monetary relief allowed by law, including: (i) restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent business practices or use of their Private Information; (ii) declaratory relief; (iii) reasonable attorneys' fees and costs under California Code of Civil Procedure §1021.5; injunctive relief; and (iv) other appropriate equitable relief.

**COUNT 10**
**CALIFORNIA CONSUMER LEGAL REMEDIES ACT,**
**Cal. Civ. Code §§1750, *et seq.* ("CLRA")**
**(On Behalf of California Plaintiffs and the California Subclass)**

366.    The California Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

367.    At all relevant times, Defendants Coinbase collected, stored, and controlled Plaintiffs' and Class Members' Private Information in connection with its cryptocurrency exchange platform. Defendant TaskUs, acting as a vendor and agent of Coinbase, provided customer support, account management, and data processing services, during which it received, maintained, and processed California Plaintiffs' and Class Members' Private Information. By providing these services to Coinbase consumers in California, TaskUs engaged in transactions

involving "services" primarily for personal, family, or household purposes, within the meaning of Cal. Civ. Code §1761(b)-(e). Both Coinbase and TaskUs are "persons" subject to the CLRA.

368. The Consumers Legal Remedies Act, Cal. Civ. Code §§1750, *et seq.* is a comprehensive statutory scheme that is to be liberally construed to protect consumers against unfair and deceptive business practices in connection with the conduct of businesses providing goods, property or services to consumers primarily for personal, family, or household use.

369. Defendants Coinbase and TaskUs are each a "person" as defined by Cal. Civ. Code §§1761(c) and 1770 and has provided "services" as defined by Cal. Civ. Code §§1761(b) and 1770.

370. California Plaintiffs and the California Class are "consumers" as defined by Cal. Civ. Code §§1761(d) and 1770 and have engaged in a "transaction" as defined by Cal. Civ. Code §§1761(e) and 1770.

371. Defendants' acts and practices were intended to and did result in the sales of products and services to California Plaintiffs and the California Subclass Members in violation of Cal. Civ. Code §1770, including:

    a. Representing that goods or services have characteristics that they do not have;

    b. Representing that goods or services are of a particular standard, quality, or grade when they were not;

    c. Advertising goods or services with intent not to sell them as advertised; and

    d. Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

372. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' Private Information.

373.    Coinbase directly represented to consumers, through its Terms of Service, Privacy Policy, and marketing, that it would implement reasonable measures to safeguard Private Information.  TaskUs, in performing services on Coinbase's behalf and maintaining consumer data, concealed its inadequate security practices and omissions, thereby reinforcing Coinbase's misrepresentations.  Consumers reasonably relied on Coinbase's express representations and on TaskUs's role as a custodian of their Private Information, the truth of which they could not have discovered.

374.    Had Defendants disclosed to California Plaintiffs and California Subclass Members that their data systems were not secure and were vulnerable to attack, Defendants would have been forced to adopt reasonable data security measures and comply with the law.  Instead, Defendants accepted and retained sensitive and valuable Private Information regarding millions of consumers, including the California Plaintiffs, the Class, and the California Subclass, while concealing their inadequate security practices.  Accordingly, Plaintiffs, the Class, and the California Subclass Members acted reasonably in relying on Defendants' misrepresentations and omissions.

375.    As a direct and proximate result of Coinbase's violations of Cal. Civ. Code §1770, California Plaintiffs and California Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including: (i) fraud and identity theft; (ii) time and expenses related to monitoring their financial accounts for fraudulent activity; (iii) an increased, imminent risk of fraud and identity theft; and (iv) loss of value of their Private Information.

376.    California Plaintiffs provided Coinbase with written notice of their CLRA claims, as required by Cal. Civ. Code §1782(a), on October 21, 2025.

377.    California Plaintiffs and the California Subclass seek injunctive and other equitable relief under the CLRA and will amend this Complaint to seek damages and any other appropriate relief if Defendants fail to cure or otherwise rectify the alleged violations.

### COUNT 11
### COLORADO SECURITY BREACH NOTIFICATION ACT,
#### Colo. Rev. Stat. §§6-1-716, *et seq.*
#### (On behalf of Plaintiff Ramo and the Colorado Subclass)

378.    Plaintiff John Ramo re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

379.    Defendants Coinbase and TaskUs are each a "covered entity" that owns or licenses computerized data that includes Personal Information as defined by Colo. Rev. Stat. §§6-1-716(1) and 6-1-716(2) ("Personal Information" as used in this Count).

380.    Plaintiff's and Colorado Subclass Members' Private Information (e.g., Social Security numbers) include Personal Information as covered by Colo. Rev. Stat. §§6-1-716(1) and 6-1-716(2).

381.    Under Colo. Rev. Stat. §6-1-716(2)(a), Defendants were required to accurately notify Plaintiff and Colorado Subclass Members of a security breach in the most expedient time possible and without unreasonable delay, but no later than thirty (30) days after determining that a security breach occurred, if unencrypted and unredacted personal information was, or was reasonably believed to have been, acquired by an unauthorized person.

382.    Defendants became aware of a breach of their security systems in which Plaintiff's and Colorado Subclass Members' personal information was reasonably believed to have been acquired by unauthorized persons, creating a material risk of harm. Accordingly, Defendants had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Colo. Rev. Stat. §6-1-716(2)(a).

383.    By failing to disclose the data breach in a timely and accurate manner, Defendants violated Colo. Rev. Stat. §6-1-716(2).

384.    As a direct and proximate result of Defendants' violations of Colo. Rev. Stat. §6-1-716, Plaintiff and Colorado Subclass Members suffered damages, including: (i) loss of value of their Private Information; (ii) out-of-pocket expenses; (iii) lost time; and (iv) an increased risk of identity theft and fraud.

385.    Plaintiff and Colorado Subclass Members seek relief under Colo. Rev. Stat. §6-1-716(4), including actual damages and equitable relief.

### COUNT 12
### COLORADO CONSUMER PROTECTION ACT,
### Colo. Rev. Stat. §§6-1-101, *et seq*.
### (On behalf of Plaintiff Ramo and the Colorado Subclass)

386.    Plaintiff John Ramo re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

387.    Defendants Coinbase and TaskUs are each a "person" as defined by Colo. Rev. Stat. §6-1-102(6).

388.    Defendants engaged in "sale[s]" as defined by Colo. Rev. Stat. § 6-1-102(10).

389.    Plaintiff and Colorado Subclass Members, as well as the general public, are actual or potential consumers of the products and services offered by Defendants.

390.    Defendants engaged in deceptive trade practices in the course of its business, in violation of Colo. Rev. Stat. §6-1-105(1), including:

     a.    Knowingly making a false representation as to the characteristics of products and services;

     a.    Representing that services are of a particular standard, quality, or grade, though Coinbase knew or should have known that they are of another;

     b.    Advertising services with intent not to sell them as advertised; and

      c.   Failing to disclose material information concerning its services, which was known at the time of an advertisement or sale when the failure to disclose the information was intended to induce the consumer to enter into the transaction.

391.   Defendants' deceptive trade practices included, but were not limited to:

      a.   Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Colorado Subclass Members' Private Information, which was a direct and proximate cause of the Coinbase data breach;

      b.   Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Coinbase data breach;

      c.   Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Colorado Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, and the GLBA, 15 U.S.C. §6801, *et seq.*;

      d.   Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and Colorado Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

      e.   Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Colorado Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, and the GLBA, 15 U.S.C. §6801, *et seq.*;

      f.   Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff's and Colorado Subclass Members' Private Information; and

      g.   Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Colorado Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, and the GLBA, 15 U.S.C. §6801, *et seq.*

392.   Defendants' representations and omissions, and failures to disclose were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and their ability to protect the confidentiality of consumers' Private Information.

393.   Coinbase directly represented to consumers, through its Terms of Service, Privacy Policy, and marketing, that it would implement reasonable measures to safeguard Private

Information.  TaskUs, in performing services on Coinbase's behalf and maintaining consumer data, concealed its inadequate security practices and omissions, thereby reinforcing Coinbase's misrepresentations.  Consumers reasonably relied on Coinbase's express representations and TaskUs's role as custodian of their Private Information, the truth of which they could not have discovered.

394.    Had Defendants disclosed that their data systems were not secure and vulnerable to attack, they would have been forced to adopt reasonable data security measures.  Instead, Defendants accepted and retained sensitive Private Information from millions of consumers, including Plaintiff and the Colorado Subclass, while concealing their inadequate security practices.

395.    Defendants acted intentionally, knowingly, and maliciously to violate Colorado's Consumer Protection Act, and recklessly disregarded Plaintiff and Subclass Members. Defendants' history of prior data breaches and security failures put them on notice that their protections were inadequate.

396.    As a direct and proximate result of Defendants' deceptive trade practices, Colorado Subclass Members suffered injuries to their legally protected interests, including their legally protected interest in the confidentiality and privacy of their personal information.

397.    Defendants' deceptive trade practices significantly impact the public, because nearly all Members of the public are actual or potential consumers of Defendants' services, and the data breach caused the exfiltration of the Private Information of thousands of individuals nationwide, including a substantial number of Colorado residents.

398.    Plaintiff and Colorado Subclass Members seek all monetary and non-monetary relief allowed by law, including the greater amount of: (i) actual damages, $500, or three times

actual damages (for Defendants' bad faith conduct); (ii) injunctive relief; and (iii) reasonable attorneys' fees and costs.

**COUNT 13**
**MAINE UNFAIR PRACTICES ACT,**
**5 Me. Rev. Stat. §§205, 213,** *et seq.*
**(On behalf of Plaintiff Panthaki and Maine Subclass)**

399.    Plaintiff Zaal Panthaki re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

400.    Defendants Coinbase and TaskUs are each a "person" as defined by 5 Me. Stat. §206(2).

401.    Defendants' conduct as alleged herein related was in the course of "[t]rade and commerce" as defined by 5 Me. Stat. §206(3).

402.    Plaintiff and Maine Subclass Members purchased goods and/or services for personal, family, and/or household purposes.

403.    Plaintiff sent a demand for relief on behalf of the Maine Subclass pursuant to 5 Me. Rev. Stat. §213(1-A) on October 21, 2025.

404.    Defendants engaged in unfair and deceptive trade acts and practices in the conduct of trade or commerce, in violation of 5 Me. Rev. Stat. §207, including:

    a.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Maine Subclass Members' Private Information, which was a direct and proximate cause of the Coinbase data breach;

    b.    Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Coinbase data breach;

    c.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Maine Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, and the GLBA, 15 U.S.C. §6801, *et seq.*, which was a direct and proximate cause of the Coinbase data breach;

d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and Maine Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Maine Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, and the GLBA, 15 U.S.C. §6801, *et seq.*;

f. Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff's and Maine Subclass Members' Private Information; and

g. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Maine Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, and the GLBA, 15 U.S.C. §6801, *et seq.*

405.     Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Coinbase's data security and ability to protect the confidentiality of consumers' Private Information.

406.     Had Defendants disclosed to Plaintiff and Maine Subclass Members that their data systems were not secure and vulnerable to attack, Defendants would have been forced to adopt reasonable data security measures and comply with the law.  Instead, Defendants were trusted with sensitive and valuable Private Information regarding millions of consumers, including Plaintiff, the Class, and the Maine Subclass.  Defendants accepted the responsibility of being stewards of this data while keeping the inadequate state of their security controls secret from the public. Accordingly, because Defendants held themselves out as maintaining a secure platform for Private Information, Plaintiff, the Class, and the Maine Subclass Members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

407.     As a direct and proximate result of Defendants' unfair and deceptive acts and conduct, Plaintiff and Maine Subclass Members have suffered and will: (i) continue to suffer

injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; (ii) time and expenses related to monitoring their financial accounts for fraudulent activity; (iii) an increased, imminent risk of fraud and identity theft; and (iv) loss of value of their Private Information.

408.    Plaintiff and the Maine Subclass seek injunctive and other equitable relief and will amend this Complaint to seek damages and any other appropriate relief if Defendants fail to make a reasonable tender of settlement or otherwise cure the violations following such notice.

**COUNT 14**
**MAINE UNIFORM DECEPTIVE TRADE PRACTICES ACT,**
**10 Me. Rev. Stat. §§1212,** *et seq.*
**(On behalf of Plaintiff Panthaki and Maine Subclass)**

409.    Plaintiff Zaal Panthaki re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

410.    Defendants Coinbase and TaskUs are each a "person" as defined by 10 Me. Rev. Stat. §1211(5).

411.    Defendants advertised, offered, or sold goods or services in Maine and engaged in trade or commerce directly or indirectly affecting the people of Maine.

412.    Defendants engaged in deceptive trade practices in the conduct of its business, in violation of 10 Me. Rev. Stat. §1212, including:

a.  Representing that goods or services have characteristics that they do not have;

b.  Representing that goods or services are of a particular standard, quality, or grade if they are of another;

c.  Advertising goods or services with intent not to sell them as advertised; and

d.  Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

413.    Defendants' deceptive trade practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Maine Subclass Members' Private Information, which was a direct and proximate cause of the Coinbase data breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Coinbase data breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Maine Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, and the GLBA, 15 U.S.C. §6801, *et seq.*, which was a direct and proximate cause of the Coinbase data breach;

d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and Maine Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Maine Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, and the GLBA, 15 U.S.C. §6801, *et seq.*;

f. Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff's and Maine Subclass Members' Private Information; and

g. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Maine Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, and the GLBA, 15 U.S.C. §6801, *et seq.*

414. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' Private Information.

415. Defendants intended to mislead Plaintiff and Maine Subclass Members and induce them to rely on its misrepresentations and omissions.

416. Had Defendants disclosed to Plaintiff and Maine Subclass Members that their data systems were not secure and vulnerable to attack, Defendants would have been forced to adopt

reasonable data security measures and comply with the law.  Instead, Defendants were trusted with sensitive and valuable Private Information regarding millions of consumers, including Plaintiff, the Class, and the Maine Subclass.  Defendants accepted the responsibility of being stewards of this data while keeping the inadequate state of their security controls secret from the public. Accordingly, because Defendants held themselves out as maintaining a secure platform for Private Information, Plaintiff, the Class, and the Maine Subclass Members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

417.    As a direct and proximate result of Defendants' deceptive trade practices, Plaintiff and Maine Subclass Members have suffered and will continue to suffer: (i) injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; (ii) time and expenses related to monitoring their financial accounts for fraudulent activity; (iii) an increased, imminent risk of fraud and identity theft; and (iv) loss of value of their Private Information.

418.    Maine Subclass Members are likely to be damaged by Defendants' ongoing deceptive trade practices.

419.    Plaintiff and the Maine Subclass Members seek all relief allowed by law, including injunctive relief under 10 Me. Rev. Stat. §1213, as well as restitution, equitable relief, and attorneys' fees and costs.

**COUNT 15**
**MASSACHUSETTS CONSUMER PROTECTION ACT,**
**Mass. Gen. Laws Ann. Ch. 93A, §§1, *et seq*.**
**(On behalf of Plaintiff Sullivan and the Massachusetts Subclass)**

420.    Plaintiff Rachel Sullivan re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

421.    Defendants Coinbase and TaskUs are "persons" as meant by Mass. Gen. Laws. Ann. Ch. 93A, §1(a).

422.    Defendants operate in "trade or commerce" as meant by Mass. Gen. Laws Ann. Ch. 93A, §1(b).

423.    Defendants advertised, offered, or sold goods or services in Massachusetts and engaged in trade or commerce directly or indirectly affecting the people of Massachusetts, as defined by Mass. Gen. Laws Ann. Ch. 93A, §1(b).

424.    Plaintiff sent a demand for relief on behalf of the Massachusetts Subclass pursuant to Mass. Gen. Laws Ann. Ch. 93A §9(3) on February 24, 2021.

425.    Defendants engaged in unfair methods of competition and unfair and deceptive acts and practices in the conduct of trade or commerce, in violation of Mass. Gen. Laws Ann. Ch. 93A, §2(a), including:

   a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Massachusetts Subclass Members' Private Information, which was a direct and proximate cause of the Coinbase data breach;

   b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Coinbase data breach;

   c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Massachusetts Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, the GLBA, 15 U.S.C. §6801, *et seq.*, and the Massachusetts Data Security statute and its implementing regulations, Mass. Gen. Laws Ann. Ch. 93H, §2 and 201 Mass. Code Regs. §17.01-05, which was a direct and proximate cause of the Coinbase data breach;

   d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and Massachusetts Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

   e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Massachusetts Subclass

Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, the GLBA, 15 U.S.C. §6801, *et seq.*, and the Massachusetts Data Security statute and its implementing regulations, Mass. Gen. Laws Ann. Ch. 93H, §2 and 201 Mass. Code Regs. 17.01-05;

f.  Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff's and Massachusetts Subclass Members' Private Information; and

g.  Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Massachusetts Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, the GLBA, 15 U.S.C. §6801, *et seq.*, and the Massachusetts Data Security statute and its implementing regulations, Mass. Gen. Laws Ann. Ch. 93H, §2 and 201 Mass. Code Regs. 17.01-05.

426.    Defendants' acts and practices were "unfair" because they fall within the penumbra of common law, statutory, and established concepts of unfairness, given that Defendants solely held the true facts about their inadequate security for Private Information, which Plaintiff and the Massachusetts Subclass Members could not independently discover.

427.    Consumers could not have reasonably avoided injury because Defendants' business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making.  By withholding important information from consumers about the inadequacy of its data security, Defendants created an asymmetry of information between themselves and consumers that precluded consumers from taking action to avoid or mitigate injury.

428.    Defendants' inadequate data security had no countervailing benefit to consumers or to competition.

429.    Defendants intended to mislead Plaintiff and Massachusetts Subclass Members and induce them to rely on their misrepresentations and omissions.  Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the

adequacy of Defendants' data security and ability to protect the confidentiality of consumers' Private Information.

430.    Defendants acted intentionally, knowingly, and maliciously to violate Massachusetts's Consumer Protection Act, and recklessly disregarded Plaintiff and Massachusetts Subclass Members' rights. Defendants' numerous past data breaches put them on notice that their security and privacy protections were inadequate.

431.    As a direct and proximate result of Defendants' deceptive trade practices, Plaintiff and Massachusetts's Subclass Members have suffered and will continue to suffer: (i) injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; (ii) time and expenses related to monitoring their financial accounts for fraudulent activity; (iii) an increased, imminent risk of fraud and identity theft; and (iv) loss of value of their Private Information.

432.    Pursuant to Mass. Gen. Laws Ch. 93A, §9(3), Plaintiff and the Massachusetts Subclass provided Defendants with written notice of their claims under the Massachusetts Consumer Protection Act on October 21, 2025.

433.    Plaintiff and the Massachusetts Subclass seek injunctive and other equitable relief under Chapter 93A and will amend this Complaint to seek damages and any other appropriate relief if Defendants fail to make a reasonable tender of settlement or otherwise cure the violations following such notice.

## COUNT 16
## NEW YORK'S INFORMATION SECURITY BREACH AND NOTIFICATION ACT,
### N.Y. Gen. Bus. Law §899-aa
### (On behalf of New York Plaintiffs and the New York Subclass)

434.    Plaintiffs Squeo, Rahman, and Mirvis ("New York Plaintiffs") re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

435.     Defendants are businesses that own or license computerized data that includes Personal Information as defined by N.Y. Gen. Bus. Law §899-aa(1)(a) ("Personal Information" as used in this Count).    Defendants also maintain computerized data that includes Personal Information which Defendants do not own.    Accordingly, it is subject to N.Y. Gen. Bus. Law §§899-aa(2)-(3).

436.     New York Plaintiffs' and New York Subclass Members' Private Information (e.g., Social Security numbers) include Personal Information covered by N.Y. Gen. Bus. Law §899-aa(1)(b).

437.     Defendants are required to give immediate notice of a breach of security of a data system to owners of Personal Information which Defendants do not own, including New York Plaintiffs and New York Subclass Members, pursuant to N.Y. Gen. Bus. Law §899-aa(3).

438.     Defendants are required to accurately notify New York Plaintiffs and New York Subclass Members if they discover a security breach, or receive notice of a security breach which may have compromised Personal Information which Defendants own or license, in the most expedient time possible and without unreasonable delay under N.Y. Gen. Bus. Law §899-aa(2).

439.     By failing to disclose the Coinbase data breach in a timely and accurate manner, Defendants violated N.Y. Gen. Bus. Law §§899-aa(2)-(3).

440.     As a direct and proximate result of Defendants' violations of N.Y. Gen. Bus. Law §§899-aa(2)-(3), New York Plaintiffs and New York Subclass Members suffered damages, as described above.

441.     New York Plaintiffs and New York Subclass Members seek relief under N.Y. Gen. Bus. Law §899-aa(6)(b), including actual damages and injunctive relief.

**COUNT 17**
**NEW YORK GENERAL BUSINESS LAW,**
**N.Y. Gen. Bus. Law §§349,** *et seq.*
**(On behalf of New York Plaintiffs and the New York Subclass)**

442.    New York Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

443.    Defendants engaged in deceptive acts or practices in the conduct of their business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law §349, including:

  a.    Failing to implement and maintain reasonable security and privacy measures to protect New York Plaintiffs' and New York Subclass Members' Private Information, which was a direct and proximate cause of the Coinbase data breach;

  b.    Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Coinbase data breach;

  c.    Failing to comply with common law and statutory duties pertaining to the security and privacy of New York Plaintiffs' and New York Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, and the GLBA, 15 U.S.C. §6801, *et seq.*, which was a direct and proximate cause of the Coinbase data breach;

  d.    Misrepresenting that they would protect the privacy and confidentiality of New York Plaintiffs' and New York Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

  e.    Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of New York Plaintiffs' and New York Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, and the GLBA, 15 U.S.C. §6801, *et seq.*

  f.    Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure New York Plaintiffs' and New York Subclass Members' Private Information; and

  g.    Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of New York Plaintiffs' and Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45 and the GLBA, 15 U.S.C. §6801, *et seq.*

444. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' Private Information.

445. Defendants acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded New York Plaintiffs' and New York Subclass Members' rights. Coinbase's numerous past data breaches put Defendants on notice that their security and privacy protections were inadequate.

446. As a direct and proximate result of Defendants' deceptive and unlawful acts and practices, New York Plaintiffs' and New York Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Private Information.

447. Defendants' deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large, including the millions of New Yorkers affected by the Coinbase data breach.

448. The above deceptive and unlawful practices and acts by Defendants caused substantial injury to New York Plaintiffs and New York Subclass Members that they could not reasonably avoid.

449. New York Plaintiffs and New York Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

**COUNT 18**
**SOUTH CAROLINA DATA BREACH SECURITY ACT,**
**S.C. Code Ann. §§39-1-90, *et seq*.**
**(On behalf of Plaintiff Ortiz and the South Carolina Subclass)**

450.    Plaintiff Rosemary Ortiz re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

451.    At all relevant times, Defendant Coinbase collected, stored, and controlled Plaintiff's and Class Members' Private Information in connection with its cryptocurrency exchange platform.  Defendant TaskUs, acting as a vendor and agent of Coinbase, provided customer support and data processing services, during which it received, maintained, and processed Plaintiff's and Class Members' Private Information.  In doing so, TaskUs functioned as a "business that maintains computerized data" within the meaning of S.C. Code Ann. §39-1-90(B).  Coinbase functioned as a "business that owns or licenses computerized data" within the meaning of S.C. Code Ann. §39-1-90(A).  Coinbase is a business that owns or licenses computerized data or other data that includes personal identifying information as defined by S.C. Code Ann. §39-1-90(A).

452.    Defendants Coinbase and TaskUs are businesses that own, license, or maintain computerized data that includes personal identifying information as defined by S.C. Code Ann. §39-1-90(A)–(B).

453.    Plaintiff's and the Class and South Carolina Subclass Members' Private Information (*e.g.*, Social Security numbers) includes personal identifying information as covered under S.C. Code Ann. §39-1-90(D)(3).

454.    Under S.C. Code Ann. §39-1-90(A)–(B), Defendants were required to accurately notify Plaintiff and Class and South Carolina Subclass Members following discovery of, or notification of, a breach of their data security systems if Private Information that was not rendered

unusable through encryption, redaction, or other methods was, or was reasonably believed to have been, acquired by an unauthorized person, creating a material risk of harm. Such notice was required to be made in the most expedient time possible and without unreasonable delay.

455.    Defendants discovered, or reasonably should have discovered, a breach of their data security systems in which Private Information that was not rendered unusable was, or was reasonably believed to have been, acquired by an unauthorized person, thereby creating a material risk of harm to Plaintiff and Class and South Carolina Subclass Members.

456.    Accordingly, Defendants had an obligation to disclose the Coinbase data breach to Plaintiff and Class and South Carolina Subclass Members in a timely and accurate manner, as mandated by S.C. Code Ann. §39-1-90(A).  To the extent TaskUs maintained the data on behalf of Coinbase, TaskUs was further obligated to notify Coinbase of the breach without unreasonable delay, and Coinbase was obligated to notify affected consumers.

457.    By failing to disclose the data breach in a timely and accurate manner, Defendants violated S.C. Code Ann. §39-1-90.

458.    As a direct and proximate result of Defendants' violations of S.C. Code Ann. §39-1-90, Plaintiff and Class and South Carolina Subclass Members suffered damages, as previously described herein, including out-of-pocket expenses, lost time, and the ongoing risk of identity theft and fraud.

459.    Plaintiff and Class and South Carolina Subclass Members seek relief under S.C. Code Ann. §39-1-90(G), including actual damages and injunctive relief requiring Defendants to implement and maintain reasonable security procedures to protect Private Information and to provide credit monitoring and identity theft protection services.

**COUNT 19**
**SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT,**
**S.C. Code Ann. §§39-5-10,** *et seq.*
**(On behalf of Plaintiff Ortiz and the South Carolina Subclass)**

460.    The Plaintiff Rosemary Ortiz re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

461.    At all relevant times, Defendant Coinbase collected, stored, and controlled Plaintiff's and Class Members' Private Information in connection with its cryptocurrency exchange platform.  Defendant TaskUs, acting as a vendor and agent of Coinbase, provided customer support, account management, and data processing services, during which it received, maintained, and processed Plaintiff's and Class Members' Private Information.  By providing these services to Coinbase consumers in South Carolina, TaskUs engaged in "trade or commerce" within the meaning of S.C. Code Ann. §39-5-10(b).  Both Coinbase and TaskUs are "persons" within the meaning of S.C. Code Ann. §39-5-10(a).

462.    Defendants Coinbase and TaskUs are each a "person," as defined by S.C. Code Ann. §39-5-10(a).

463.    South Carolina's Unfair Trade Practices Act (SC UTPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. §39-5-20.

464.    Defendants advertised, offered, or sold goods or services in South Carolina and engaged in trade or commerce directly or indirectly affecting the people of South Carolina, as defined by S.C. Code Ann. §39-5-10(b).

465.    Defendants engaged in unfair and deceptive acts and practices in violation of S.C. Code Ann. §39-5-20, including but not limited to:

    a.  Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class and South Carolina Subclass Members' Private Information, which was a direct and proximate cause of the Coinbase data breach;

b.  Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Coinbase data breach;

c.  Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class and South Carolina Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45 and the GLBA, 15 U.S.C. §6801, *et seq.*, which was a direct and proximate cause of the Coinbase data breach;

d.  Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Class and South Carolina Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e.  Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class and South Carolina Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, the GLBA, 15 U.S.C. §6801, *et seq.*, and HIPAA, 42 U.S.C. §1320d;

f.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and South Carolina Subclass Members' Private Information; and

g.  Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class and South Carolina Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, and the GLBA, 15 U.S.C. §6801, *et seq.*

h.  Failing to timely disclose the data breach to consumers, regulators, and/or Coinbase (in the case of TaskUs), despite statutory and common law duties requiring prompt and accurate notification;

i.  Failing to properly supervise, audit, and monitor vendors and contractors with access to Private Information, including Coinbase's failure to oversee TaskUs and TaskUs's failure to safeguard information entrusted to it;

j.  Retaining Private Information for longer than was reasonably necessary for legitimate business purposes, thereby increasing the risk and severity of harm from the data breach; and

k.  Collecting, using, and/or monetizing Private Information without ensuring adequate protections to safeguard it against unauthorized access, disclosure, or misuse.

466.    Defendants' acts and practices had, and continue to have, the tendency or capacity to deceive.

467.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Coinbase's data security and ability to protect the confidentiality of consumers' Private Information.

468.    Coinbase directly represented to consumers, through its Terms of Service, Privacy Policy, and marketing, that it would implement reasonable measures to safeguard Private Information. TaskUs, in performing services on Coinbase's behalf and maintaining consumer data, concealed its inadequate security practices and omissions, thereby reinforcing Coinbase's misrepresentations. Consumers reasonably relied on Coinbase's express representations and TaskUs's role as a custodian of their Private Information, the truth of which they could not have discovered.

469.    Had Defendants disclosed that their data systems were not secure and vulnerable to attack, they would have been forced to adopt reasonable security measures. Instead, Defendants accepted and retained sensitive Private Information from consumers, including Plaintiff and the South Carolina Subclass, while concealing their inadequate security practices.

470.    Defendants had a duty to disclose the above-described facts due to the circumstances of this case, the sensitivity and extensivity of Private Information in its possession, and the generally accepted professional standards in its industry. Such a duty is also implied by law due to the nature of the relationship between consumers, including Plaintiff and the South Carolina Subclass, and Defendants, because consumers are unable to fully protect their interests with regard to the Private Information in Defendants' possession, and place trust and confidence in Defendants. Defendants' duty to disclose also arose from its:

a.   Their exclusive knowledge of security deficiencies;

b.   Their active concealment of those deficiencies; and/or

c.   Their incomplete representations concerning data security and integrity while and its prior data breaches, while purposefully withholding material facts from Plaintiff and the South Carolina Subclass that contradicted these representations.

471.    Defendants' business acts and practices offend an established public policy, or are immoral, unethical, or oppressive.  These public policies are reflected in laws such as the FTC Act, 15 U.S.C. §45, the GLBA, 15 U.S.C. §6801, *et seq.*, and the South Carolina Data Breach Security Act, S.C. Code §39-1-90, *et seq.*

472.    Defendants' failure to implement reasonable security measures was immoral, unethical, and oppressive in light of their knowledge of prior data breaches, the sensitivity of the Private Information, and their role as entrusted custodians of consumers' data.

473.    Defendants' unfair and deceptive acts and practices adversely affected the public interest because such practices have the potential for repetition, are part of Defendants' regular business conduct, and impact the public at large, including South Carolinians impacted by the data breach.

474.    Defendants' unfair and deceptive acts or practices have the potential for repetition because similar security failures and breaches occurred in the past, and absent judicial intervention are likely to recur.

475.    Defendants' violations present a continuing risk to Plaintiff, the Class, the South Carolina Subclass, and the general public.

476.    Defendants acted intentionally, knowingly, and maliciously in violating the SC UTPA, and recklessly disregarded the rights of Plaintiff and the Class and Subclass Members.

477.    As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and the Class and South Carolina Subclass Members have suffered ascertainable losses of money and property, including fraud and identity theft; time and expenses monitoring financial accounts; an increased, imminent risk of fraud and identity theft; and the loss of value of their Private Information.

478.    Plaintiff and the Class and South Carolina Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, treble damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs, pursuant to S.C. Code Ann. §39-5-140.

## COUNT 20
## TEXAS DECEPTIVE TRADE PRACTICES—CONSUMER PROTECTION ACT,
### Texas Bus. & Com. Code §§17.41, *et seq*.
### (On behalf of Texas Plaintiffs and the Texas Subclass)

479.    Plaintiffs Gonzalez and Crous ("Texas Plaintiffs") re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

480.    Coinbase and TaskUs are each a "person," as defined by Tex. Bus. & Com. Code §17.45(3).

481.    Texas Plaintiffs and the Texas Subclass Members are "consumers," as defined by Tex. Bus. & Com. Code §17.45(4).

482.    Defendants advertised, offered, or sold goods or services in Texas and engaged in trade or commerce directly or indirectly affecting the people of Texas, as defined by Tex. Bus. & Com. Code §17.45(6).

483.    Defendants engaged in false, misleading, or deceptive acts and practices, in violation of Tex. Bus. & Com. Code §17.46(b), including:

       a.  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have;

    b.   Representing that goods or services are of a particular standard, quality or grade, if they are of another; and

    c.   Advertising goods or services with intent not to sell them as advertised.

484.    Defendants' false, misleading, and deceptive acts and practices include:

    a.   Failing to implement and maintain reasonable security and privacy measures to protect Texas Plaintiffs' and Texas Subclass Members' Private Information, which was a direct and proximate cause of the Coinbase data breach;

    b.   Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Coinbase data breach;

    c.   Failing to comply with common law and statutory duties pertaining to the security and privacy of Texas Plaintiffs' and Texas Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, the GLBA, 15 U.S.C. §6801, *et seq.*, and Texas's data security statute, Tex. Bus. & Com. Code §521.052, which was a direct and proximate cause of the Coinbase data breach;

    d.   Misrepresenting that they would protect the privacy and confidentiality of Texas Plaintiffs' and Texas Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

    e.   Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Texas Plaintiffs' and Texas Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, the GLBA, 15 U.S.C. §6801, *et seq.*, and Texas's data security statute, Tex. Bus. & Com. Code §521.052;

    f.   Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Texas Plaintiffs' and Texas Subclass Members' Private Information; and

    g.   Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Texas Plaintiffs' and Texas Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, the GLBA, 15 U.S.C. §6801, *et seq.*, and Texas's data security statute, Tex. Bus. & Com. Code §521.052.

485.    Defendants intended to mislead Texas Plaintiffs and Texas Subclass Members and induce them to rely on their misrepresentations and omissions.

486.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' Private Information.

487.    Had Defendants disclosed to Texas Plaintiffs and Texas Subclass Members that their data systems were not secure and, thus, vulnerable to attack, Defendants would have been unable to continue in business, and they would have been forced to adopt reasonable data security measures and comply with the law.  Instead, Defendants were trusted with sensitive and valuable Private Information regarding millions of consumers, including Texas Plaintiffs, the Class, and the Texas Subclass.  Defendants accepted the responsibility of being stewards of this data while keeping the inadequate state of their security controls secret from the public.  Accordingly, because Defendants held themselves out as maintaining a secure platform for Private Information data, Texas Plaintiffs, the Class, and the Texas Subclass Members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

488.    Defendants had a duty to disclose the above facts due to the circumstances of this case, the sensitivity and extensivity of the Private Information in their possession, and the generally accepted professional standards in their industry.  This duty arose because Members of the public, including Texas Plaintiffs and the Texas Subclass, repose a trust and confidence in Defendants.  In addition, such a duty is implied by law due to the nature of the relationship between consumers, including Texas Plaintiffs and the Texas Subclass, and Defendants because consumers are unable to fully protect their interests with regard to their data, and placed trust and confidence in Defendants.  Defendants' duty to disclose also arose from their:

      a.  Possession of exclusive knowledge regarding the security of the data in their systems;

      b.  Active concealment of the state of their security; and/or

      c.  Incomplete representations about the security and integrity of their computer and data systems, and their prior data breaches, while purposefully withholding material facts from Plaintiffs and the Texas Subclass that contradicted these representations.

489.     Defendants engaged in unconscionable actions or courses of conduct, in violation of Tex. Bus. & Com. Code Ann. §17.50(a)(3). Defendants engaged in acts or practices which, to consumers' detriment, took advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree.

490.     Consumers, including Texas Plaintiffs and Texas Subclass Members, lacked knowledge about deficiencies in Defendants' data security because this information was known exclusively by Defendants. Consumers also lacked the ability, experience, or capacity to secure the Private Information in Defendants' possession or to fully protect their interests with regard to their data. Texas Plaintiffs and Texas Subclass Members lack expertise in information security matters and do not have access to Defendants' systems in order to evaluate their security controls. Defendants took advantage of their special skills and access to Private Information to hide their inability to protect the security and confidentiality of Texas Plaintiffs and Texas Subclass Members' Private Information.

491.     Defendants intended to take advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree, with reckless disregard of the unfairness that would result. The unfairness resulting from Defendants' conduct is glaringly noticeable, flagrant, complete, and unmitigated. The Coinbase data breach, which resulted from Defendants' unconscionable business acts and practices, exposed Texas Plaintiffs and Texas Subclass Members to a wholly unwarranted risk to the safety of their Private Information and the security of their identity or credit, and worked a substantial hardship on a significant and unprecedented number of

consumers.  Texas Plaintiffs and Texas Subclass Members cannot mitigate this unfairness because they cannot undo the data breach.

492.    Defendants acted intentionally, knowingly, and maliciously to violate Texas's Deceptive Trade Practices-Consumer Protection Act, and recklessly disregarded Texas Plaintiffs' and Texas Subclass Members' rights.  Coinbase's numerous past data breaches put Defendants on notice that their security and privacy protections were inadequate.

493.    As a direct and proximate result of Defendants' unconscionable and deceptive acts or practices, Texas Plaintiffs and Texas Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Private Information. Defendants' unconscionable and deceptive acts or practices were a producing cause of Texas Plaintiffs' and Texas Subclass Members' injuries, ascertainable losses, economic damages, and non-economic damages, including their mental anguish.

494.    Defendants' violations present a continuing risk to Texas Plaintiffs and Texas Subclass Members as well as to the general public.

495.    Pursuant to Texas Business and Commerce Code §17.505(a), Texas Plaintiffs and the Texas Subclass provided Defendants with written notice of their claims under the Texas Deceptive Trade Practices–Consumer Protection Act ("DTPA") on October 21, 2025.

496.    Texas Plaintiffs and the Texas Subclass seek injunctive and other equitable relief under the Texas Deceptive Trade Practices–Consumer Protection Act and will amend this Complaint to seek damages and any other appropriate relief if Defendants fail to cure or otherwise rectify the alleged violations following such notice.

## COUNT 21
## WASHINGTON DATA BREACH NOTICE ACT,
### Wash. Rev. Code §§19.255.010, *et seq.*
### (On behalf of Plaintiff Quito and the Washington Subclass)

497.    Plaintiff Quito re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

498.    Defendants are businesses that own or license computerized data that includes Personal Information as defined by Wash. Rev. Code §19.255.010(1).

499.    Plaintiff's and Washington Subclass Members' Private Information includes Personal Information as covered under Wash. Rev. Code §19.255.010(5).

500.    Defendants are required to accurately notify Plaintiff and Washington Subclass Members following discovery or notification of the breach of their data security system if Private Information was, or is reasonably believed to have been, acquired by an unauthorized person and the Private Information was not secured, in the most expedient time possible and without unreasonable delay under Wash. Rev. Code §19.255.010(1).

501.    Because Defendants discovered a breach of their security system in which Private Information was, or is reasonably believed to have been, acquired by an unauthorized person and the Private Information was not secured, Defendants had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Wash. Rev. Code §19.255.010(1).

502.    By failing to disclose the Coinbase data breach in a timely and accurate manner, Defendants violated Wash. Rev. Code §19.255.010(1).

503.    As a direct and proximate result of Defendants' violations of Wash. Rev. Code §19.255.010(1), Plaintiff and Washington Subclass Members suffered damages, as described above.

504. Plaintiff and Washington Subclass Members seek relief under Wash. Rev. Code §§19.255.010(13)(a) and 19.255.010(13)(b), including actual damages and injunctive relief.

**COUNT 22**
**WASHINGTON CONSUMER PROTECTION ACT,**
**Wash. Rev. Code Ann. §§19.86.020, *et seq*.**
**(On behalf of Plaintiff Quito and the Washington Subclass)**

505. Plaintiff Quito re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

506. Coinbase and TaskUs are each a "person," as defined by Wash. Rev. Code Ann. §19.86.010(1).

507. Defendants advertised, offered, or sold goods or services in Washington and engaged in trade or commerce directly or indirectly affecting the people of Washington, as defined by Wash. Rev. Code Ann. §19.86.010 (2).

508. Defendants engaged in unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of Wash. Rev. Code Ann. §19.86.020, including:

> a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Washington Subclass Members' Private Information, which was a direct and proximate cause of the Coinbase data breach;

> b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Coinbase data breach;

> c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Washington Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, the GLBA, 15 U.S.C. §6801, *et seq.*, which was a direct and proximate cause of the Coinbase data breach;

> d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and Washington Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

    e.   Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Washington Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45 and the GLBA, 15 U.S.C. §6801, *et seq.*

    f.   Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff's and Washington Subclass Members' Private Information; and

    g.   Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Washington Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45 and the GLBA, 15 U.S.C. §6801, *et seq.*

509.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' Private Information.

510.    Defendants acted intentionally, knowingly, and maliciously to violate Washington's Consumer Protection Act, and recklessly disregarded Plaintiff's and Washington Subclass Members' rights. Coinbase's numerous past data breaches put Defendants on notice that their security and privacy protections were inadequate.

511.    Defendants' conduct is injurious to the public interest because it violates Wash. Rev. Code Ann. §19.86.020, violates a statute that contains a specific legislation declaration of public interest impact, and/or injured persons and had and has the capacity to injure persons. Further, their conduct affected the public interest, including the millions of Washingtonians affected by the Coinbase Data Breach.

512.    As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices, Plaintiff and Washington Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to

monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Private Information.

513.    Plaintiff and Washington Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, treble damages, injunctive relief, civil penalties, and attorneys' fees and costs.

**COUNT 23**
**WISCONSIN NOTICE OF UNAUTHORIZED ACQUISITION OF PERSONAL INFORMATION,**
**Wis. Stat. §§134.98(2), *et seq*.**
**(On behalf of Wisconsin Plaintiffs and the Wisconsin Subclass)**

514.    Plaintiffs John and Neu ("Wisconsin Plaintiffs") re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

515.    Defendants are businesses that maintain or license Personal Information as defined by Wis. Stat. §134.98(2).

516.    Wisconsin Plaintiffs' and Wisconsin Subclass Members' Private Information (*e.g.*, Social Security numbers) includes Personal Information as covered under Wis. Stat. §134.98(1)(b).

517.    Defendants are required to accurately notify Wisconsin Plaintiffs and Wisconsin Subclass Members if they know that Private Information in their possession has been acquired by a person whom they have not authorized to acquire the Private Information within a reasonable time under Wis. Stat. §§134.98(2)-(3)(a).

518.    Because Defendants knew that Private Information in their possession had been acquired by a person whom they have not authorized to acquire the Private Information, Defendants had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Wis. Stat. §134.98(2).

519.    By failing to disclose the Coinbase data breach in a timely and accurate manner, Defendants violated Wis. Stat. §134.98(2).

520.    As a direct and proximate result of Defendants' violations of Wis. Stat. §134.98(3)(a), Wisconsin Plaintiffs and Wisconsin Subclass Members suffered damages, as described above.

521.    Wisconsin Plaintiffs and Wisconsin Subclass Members seek relief under Wis. Stat. §134.98, including actual damages and injunctive relief.

**COUNT 24**
**WISCONSIN DECEPTIVE TRADE PRACTICES ACT,**
**Wis. Stat. §100.18**
**(On behalf of Wisconsin Plaintiffs and the Wisconsin Subclass)**

522.    The Wisconsin Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

523.    Coinbase and TaskUs are each a "person, firm, corporation or association," as defined by Wis. Stat. §100.18(1).

524.    The Wisconsin Plaintiffs and Wisconsin Subclass Members are Members of "the public," as defined by Wis. Stat. §100.18(1).

525.    With intent to sell, distribute, or increase consumption of merchandise, services, or anything else offered by Defendants to Members of the public for sale, use, or distribution, Defendants made, published, circulated, placed before the public or caused (directly or indirectly) to be made, published, circulated, or placed before the public in Wisconsin advertisements, announcements, statements, and representations to the public which contained assertions, representations, or statements of fact which are untrue, deceptive, and/or misleading, in violation of Wis. Stat. §100.18(1).

526.    Defendants also engaged in the above-described conduct as part of a plan or scheme, the purpose or effect of which was to sell, purchase, or use merchandise or services not as advertised, in violation of Wis. Stat. §100.18(9).

527.    Defendants' deceptive acts, practices, plans, and schemes include:

a.    Failing to implement and maintain reasonable security and privacy measures to protect Wisconsin Plaintiffs' and Wisconsin Subclass Members' Private Information, which was a direct and proximate cause of the Coinbase data breach;

b.    Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Coinbase data breach;

c.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Wisconsin Plaintiffs' and Wisconsin Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45 and the GLBA, 15 U.S.C. §6801, *et seq.,* which was a direct and proximate cause of the Coinbase data breach;

d.    Misrepresenting that they would protect the privacy and confidentiality of Wisconsin Plaintiffs' and Wisconsin Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e.    Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Wisconsin Plaintiffs' and Wisconsin Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45, and the GLBA, 15 U.S.C. §6801, *et seq.*

f.    Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Wisconsin Plaintiffs' and Wisconsin Subclass Members' Private Information; and

g.    Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Wisconsin Plaintiffs' and Wisconsin Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. §45 and the GLBA, 15 U.S.C. §6801, *et seq.*

528.    Defendants intended to mislead Wisconsin Plaintiffs and Wisconsin Subclass Members and induce them to rely on their misrepresentations and omissions.

529.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Coinbase's data security and ability to protect the confidentiality of consumers' Private Information.

530.    Defendants had a duty to disclose the above-described facts due to the circumstances of this case, the sensitivity and extensivity of the Private Information in their possession, and the generally accepted professional standards in their industries.  This duty arose because Members of the public, including Wisconsin Plaintiffs and the Wisconsin Subclass, repose a trust and confidence in Defendants.  Instead, Defendants were trusted with sensitive and valuable Private Information regarding millions of consumers, including Wisconsin Plaintiffs, the Class, and the Wisconsin Subclass.  Defendant accepted the responsibility of being stewards of this data while keeping the inadequate state of their security controls secret from the public.  Accordingly, because Defendants held themselves out as maintaining secure platforms for Private Information data, Wisconsin Plaintiffs, the Class, and the Wisconsin Subclass Members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.  In addition, such a duty is implied by law due to the nature of the relationship between consumers—including Wisconsin Plaintiffs and the Wisconsin Subclass—and Defendants, because consumers are unable to fully protect their interests with regard to their data, and placed trust and confidence in Defendants.  Defendants' duty to disclose also arose from their:

 a.  Possession of exclusive knowledge regarding the security of the data in their systems;

 b.  Active concealment of the state of their security; and/or

 c.  Incomplete representations about the security and integrity of their computer and data systems, and their prior data breaches, while purposefully withholding material facts from Wisconsin Plaintiffs and the Wisconsin Subclass that contradicted these representations.

531.    Defendants' failure to disclose the above-described facts is the same as actively representing that those facts do not exist.

532.    Defendants acted intentionally, knowingly, and maliciously to violate the Wisconsin Deceptive Trade Practices Act, and recklessly disregarded Wisconsin Plaintiffs and

Wisconsin Subclass Members' rights.  Coinbase's numerous past data breaches put Defendants on notice that their security and privacy protections were inadequate.

533.    As a direct and proximate result of Defendants' deceptive acts or practices, Wisconsin Plaintiffs and Wisconsin Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Private Information.

534.    Defendants have an ongoing duty to all Defendants' customers to refrain from deceptive acts, practices, plans, and schemes under Wis. Stat. §100.18.

535.    Wisconsin Plaintiffs and Wisconsin Subclass Members seek all monetary and non-monetary relief allowed by law, including damages, reasonable attorneys' fees, and costs under Wis. Stat. §100.18(11)(b)(2), injunctive relief, and punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on their own behalf and on behalf of all others similarly situated, pray for relief as follows:

A.    For an Order certifying this case as a class action and appointing Plaintiffs and their counsel to represent the Class;

B.    For an award of actual damages, compensatory damages, statutory damages, and nominal damages, in an amount to be determined, as allowable by law;

C.    For injunctive and other equitable relief to ensure the protection of the sensitive information of Plaintiffs and the Class which remains in

Defendants' possession;

D.  For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

E.  Pre- and post-judgment interest on any amounts awarded; and

F.  Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiffs hereby demand a trial by jury on all claims so triable.

DATED: October 24, 2025                      Respectfully submitted,

*/s/ Joseph P. Guglielmo*
Joseph P. Guglielmo
Ethan S. Binder
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
jguglielmo@scott-scott.com
ebinder@scott-scott.com

Melissa R. Emert
Gary S. Graifman
**KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.**
135 Chestnut Ridge Road
Suite 200
Montvale, NJ 07645
Telephone: (201) 391-7000
memert@kgglaw.com
ggraifman@kgglaw.com

M. Anderson Berry**
Gregory Haroutunian
Timothy W. Emery**
Patrick B. Reddy**
Paul Cipriani**
Brook E. Garberding**
**EMERY REDDY, PLLC**

600 Stewart Street, Suite 1100
Seattle, WA 98101
Telephone: (916) 823-6955
Facsimile: (206) 441-8711
anderson@emeryreddy.com
gregory@emeryreddy.com
emeryt@emeryreddy.com
reddyp@emeryreddy.com
paul@emeryreddy.com
brook@emeryreddy.com

*Proposed Interim Co-Lead Counsel*

Israel David
Adam M. Harris
**ISRAEL DAVID LLC**
60 Broad Street, Suite 2900
New York, NY 10004
Telephone: (212) 350-8850
israel.david@davidllc.com
adam.harris@davidllc.com

*Proposed Liaison Counsel*

Sabita J. Soneji**
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, CA 94612
Telephone: (510) 254-6808
ssoneji@tzlegal.com

Amber L. Schubert*
Robert C. Schubert**
Dustin L. Schubert**
**SCHUBERT JONCKHEER & KOLBE
LLP**
2001 Union St., Suite 200
San Francisco, California 94123
Telephone: (415) 788-4220
Facsimile: (415) 788-0161
aschubert@sjk.law
rschubert@sjk.law
dschubert@sjk.law

John J. Nelson, Esq.**
**MILBERG COLEMAN BRYSON**

**PHILLIPS GROSSMAN, PLLC**
280 S. Beverly Drive, Penthouse
Beverly Hills, California 90212
Telephone: (917) 471-1894
jnelson@milberg.com

Ken Grunfeld*
Steven P. Sukert
Jeff Ostrow**
**KOPELOWITZ OSTROW P.A.**
1 West Las Olas Blvd., Ste. 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
grunfeld@kolawyers.com
sukert@kolawyers.com
ostrow@kolawyers.com

*Proposed Plaintiffs' Executive Committee Members*

Matthew J. Langley*
David S. Almeida*
Elena Belov
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, IL 60614
Telephone: (708) 529-5418
matt@almeidalawgroup.com
david@almeidalawgroup.com
elena@almeidalawgroup.com

Erika Angelos Heath
**FRANCIS MAILMAN SOUMILAS, P.C.**
351 California Street, Suite 700
San Francisco, CA 94104
Telephone: (628) 246-1352
Facsimile: (215) 940-8000
eheath@consumerlawfirm.com

James A. Francis**
**FRANCIS MAILMAN SOUMILAS, P.C.**
1600 Market Street, Suite 2510
Philadelphia, PA 19103
Telephone: (215) 735-8600
Facsimile: (215) 940-8000
jfrancis@consumerlawfirm.com

112

Brian P. Murray
**GLANCY PRONGAY & MURRAY LLP**
230 Park Avenue, Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
bmurray@glancylaw.com

Paul C. Whalen
**GLANCY PRONGAY & MURRAY LLP**
768 Plandome Road
Manhasset, NY 11030
Telephone: (516) 426-6870
pcwhalen@gmail.com

Jeffrey S. Goldenberg*
**GOLDENBERG SCHNEIDER, LPA**
4445 Lake Forest Drive, Suite 490
Cincinnati, OH 45242
Telephone: (513) 345-8291
jgoldenberg@gs-legal.com

Lynda J. Grant
**THE GRANT LAW FIRM, PLLC**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone: (212) 292-4441
Facsimile: (212) 292-4442
lgrant@grantfirm.com

Manuel S. Hiraldo, Esq.**
**HIRALDO P.A.**
401 E. Las Olas Boulevard
Suite 1400
Ft. Lauderdale, Florida 33301
Telephone: (954) 400-4713
mhiraldo@hiraldolaw.com

Ignacio J. Hiraldo**
**IJH LAW**
1100 Town & Country Road Suite 1250
Orange, CA 92868
Telephone: (657) 200-1403
ijhiraldo@ijhlaw.com

Kevin Laukaitis*
**LAUKAITIS LAW LLC**
954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, PR 00907
Telephone: (215) 789-4462
klaukaitis@laukaitislaw.com

Brett R. Cohen
**LEEDS BROWN LAW, P.C**.
One Old Country Road, Suite 347
Carle Place, New York 11514
Telephone: (516) 873-9550
bcohen@leedsbrownlaw.com

Charles E. Schaffer*
**LEVIN SEDRAN & BERMAN, LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone: (215) 592-1500
cschaffer@lfsblaw.com

Eric Poulin*
Paul J. Doolittle, Esq.*
**POULIN | WILLEY | ANASTOPOULO**
32 Ann Street
Charleston, SC 29403
Telephone: (803) 222-2222
Facsimile: (843) 494-5536
paul.doolittle@poulinwilley.com
cmad@poulinwilley.com

John T. Jasnoch**
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway
Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565
Facsimile: 619-233-0508
jjasnoch@scott-scott.com

Daniel Srourian, Esq.*
**SROURIAN LAW FIRM, P.C.**
468 N. Camden Drive, Suite 200
Beverly Hills, CA 90210

Telephone: (213) 474-3800
Facsimile: (213) 471-4160
daniel@slfla.com

*Additional Plaintiffs Counsel*

\* Admitted *pro hac vice*
\*\* *pro hac vice forthcoming*